**UNITED STATES of America**

v.

**William J. LAVERICK, Appellant in No. 14874**

**Harrison F. Tryon, Appellant in No. 14875**

**Malcolm Schaeffer, Appellant in No. 14876.**

**Nos. 14874–14876.**

United States Court of Appeals
Third Circuit.

Argued Nov. 19, 1964.

Decided July 15, 1965.

Milton Kosene, Fair Haven, N. J., for appellant Laverick.

Charles Frankel, Asbury Park, N. J., for appellant Tryon.

Robert Friedlander, Asbury Park, N. J., on the brief, for appellant Schaeffer.

Robert A. Baime, Newark, N. J. (David M. Satz., Jr., U. S. Atty., Newark, N. J., on the brief), for appellee.

Before STALEY, GANEY and FREEDMAN, Circuit Judges.

GANEY, Circuit Judge.

This consolidated appeal comes before the Court for review of the conviction of three defendants under Sections 2, 202, 281 and 371 of Title 18, United States Code.[1]

The parties involved are defendant, William J. Laverick, a former Government employee, in charge of a department at Fort Monmouth, New Jersey, whose responsibility it was to certify the technical ability and plant capacity of firms bidding on Signal Corps' contracts and to approve any technical changes in contract specifications. The approval of this department was a prerequisite to receiving an award. Defendant, Harrison F. Tryon, was chief of the Logistics Engineering Division at Fort Monmouth and was a direct subordinate of Laverick's, as well as the custodian of lists containing the specifications of all component parts used in these contracts. Defendant, Malcolm Schaeffer, was a former employee of Laverick's department and later a manu-

---

1. The relevant provisions are as follows:

§ 2 Title 18 U.S.C. provides that one who aids or abets the commission of a crime is guilty as a principal.

§ 202 Title 18 U.S.C. proscribes the receipt of money by an employee of the United States with the intent to have his decision influenced with regard to a matter before him in his official capacity.

§ 281 Title 18 U.S.C. punishes an employee of the United States who accepts compensation for services which he renders in relation to a matter in which the United States has an interest, before an agency of the United States.

§ 371 Title 18 U.S.C. prohibits any conspiracy to commit an offense against the United States.

facturer's representative of Consad, Inc., in their attempts to secure contracts with the Government at Fort Monmouth, New Jersey, from March through May 26, 1962, when a retainer of $250 per month was cancelled, but nevertheless, Consad continued getting in touch with him thereafter. Consad, Inc., was an electronic components manufacturer which had, at the time of the alleged crime, a series of bids pending before the Signal Corps at Fort Monmouth, New Jersey. Consad, Inc., had experienced great difficulty in obtaining Government contracts because of its inability to convince the Signal Corps of its capacity to manufacture the finished product.

The facts, briefly stated, are as follows:

Robert Snoyer was president of Consad, Inc., and on June 6, 1962, was in New York City when he received a wire from his office in Santa Monica, California, concerning a certain bid his company then had pending at Fort Monmouth, New Jersey. In order to obtain the requested information, Snoyer attempted to get in touch with his Santa Monica plant, as well as his Monterey plant in California, but was unable to find anyone at either place who could give him the requisite information. He then called the defendant, Schaeffer, at Fort Monmouth, and told him of the wire he had received, and asked him to check into the matter and see if he could identify the equipment. Schaeffer called back, identifying the equipment, which had an established value of approximately $2,500,000, and Schaeffer indicated that Snoyer would have the same difficulty he had had in the past with the people at Fort Monmouth, and told him that if he hoped to obtain any business, he would need the help of certain people at Fort Monmouth, and that for a fee of 2% of the contract price he could expect to receive all the approvals necessary to obtain the contract. Snoyer told him that he would want to meet the principals involved who could deliver the contract and the approvals. Schaeffer told Snoyer that he would come

to New York that next morning and he would introduce him to Laverick who was the one who could be most helpful in securing the contract. Schaeffer came to New York on June 7, 1962, and he and Snoyer drove down to Laverick's home and there Snoyer asked Laverick to confirm Schaeffer's statement that what he told him was true and Laverick replied, indicating Schaeffer, "You do what Muggsy tells you to do and everything will be O.K. * * *" To this, Snoyer answered, "All right." Later, when they were about to leave, Snoyer being somewhat doubtful about the money concerned, since on the way down to Laverick's home Schaeffer had reduced the price from 2% of $2,500,000, or $48,000.-00, to $20,000.00 as the amount of the payment, and therefore asked Schaeffer whether Laverick knew about this and was still willing to go through with the deal. Schaeffer thereupon walked apart from Snoyer and whispered something to Laverick which Snoyer testified he could not overhear, but that he heard Laverick's reply, "Yes, you're damn right I will.", and Schaeffer, upon returning to Snoyer, came back and said, "You heard him, so everything is O.K."

Schaeffer then drove Snoyer to Philadelphia, and on the way over, he advised Snoyer to call him the next day and he would tell him what he had to do in California, in order to pass the survey which was necessary for the approval of the contract. Schaeffer and Snoyer also had a discussion on how the tax problem on the money to be paid should be avoided and Schaeffer advised Snoyer that it would be necessary for him to take care of his (Schaeffer's) taxes, inasmuch as Schaeffer insisted that the money was to be paid directly to him and he would make the proper disposition thereof.

From Philadelphia, Snoyer proceeded to Washington, where he confided what had transpired to one Nicodemus, a newspaper reporter, who had been making a study of procurement orders, who told him to contact the F.B.I., which Snoyer did, and, after five hours discussion with

the F.B.I., Snoyer left for California, without signing any statement of the conversation which had ensued.

Snoyer called the next day and was told by Schaeffer that he was sending some documents to him which would be very helpful for the company when the survey team came from Fort Monmouth and arrived at Consad's plant. After Snoyer's arrival in California, he was contacted by the F.B.I. of Los Angeles, and he reported to them that he had received a package from Schaeffer which he brought to the Santa Monica office of the F.B.I. and it was found to contain some provisioning lists and item description lists taken from Signal Corps' files. Further testimony showed that these lists were not open to the public, were confidential, and were given to the defendant, Laverick, by the defendant, Tryon, through Tryon's secretary.

After the receipt of these documents by Consad in California, which were sent by Schaeffer and taken to the office of the F.B.I., a series of telephone conversations were had between Schaeffer and Snoyer, which were recorded by the F.B.I., as well as telephone conversations between Snoyer and Laverick and Snoyer and Tryon. These conversations occurred between June 14th and July 11th, and during one such conversation between Schaeffer and Snoyer, Schaeffer advised Snoyer that he should bring East with him between $4,500.00 and $5,000.00 in cash to be paid by Schaeffer to four people at Fort Monmouth. Snoyer, however, wanted to meet the principals to whom the money was to be paid and Schaeffer was unwilling, saying that he would distribute the same. However, Snoyer withdrew $3,000.00 from the bank and came East with Agent Stein of the F.B.I., the money beng identified at the Newark office of the F.B.I., and placed in envelopes, one of which contained an amount of $850.00, the other $750.00. The testimony shows that the F.B.I. gave no instructions to Snoyer other than he was not to give the envelope containing the money to anyone, unless the one receiving it knew it was money, and that

there was some basis for the payment of it.

Between June 8th, and June 12th a survey team, under one Mayerson, visited the Consad plant in California, and made a technical ability evaluation to determine whether it could technically produce the equipment upon which it had bid. A report was filed by the survey team, under Mayerson, stating that Consad was not qualified, and Laverick, though he had authority to overrule the report, did not so do. Snoyer, at this time, was unaware of this conduct on Laverick's part. The Contractor Evaluation Board, the highest authority with respect to contracts of this nature, also approved the report. Later, Snoyer, upon learning of the unfavorable report which the survey team had made, was assured on or about June 15th, by Schaeffer that certain of the information of the survey team was in error and told Snoyer, "Well, don't worry about that because Bill will overrule them. Don't concern yourself with it." He also advised Snoyer that there were various details that were wrong with Consad's facilities and that was the reason they could not give technical approval, but Schaeffer again assured Snoyer, " * * * that these people would be overruled."

An F.B.I. Agent, Colby, testified to a telephone conversation between Snoyer and Tryon on June 20th, in which Tryon stated he was familiar with the entire matter and that he would be able to help Consad after the award was made and that he had already helped, to some extent, with Schaeffer. On July 12, 1962, arrangements were made by Schaeffer for Snoyer to have dinner at the Shadow-Brook Restaurant in Shrewsbury, New Jersey, with Tryon and Laverick and other Fort Monmouth personnel. Snoyer testified, however, that at this meeting Laverick assured Snoyer that the Small Business Administration, which had authority to overrule everything which had gone on before, would grant Consad a Certificate of Competency. He, additionally, assured Snoyer that he was helping all he could with Consad, as was Tryon,

and when they had secured the contract, he would make it profitable by ordering spare parts. Snoyer testified that out of the presence of the other persons, he showed Schaeffer the cash he had brought by exhibiting the envelopes containing the cash to him. Schaeffer, likewise, knew at this meeting that the survey team had reported that Consad was technically unqualified to perform the work under their bid. Later in the evening at the Shadow-Brook Restaurant, when Snoyer visited the men's room with Laverick, upon leaving he handed one of the envelopes to Laverick which contained the cash and asked him if he thought he deserved it and Laverick said, "Yes." Later, Snoyer took the defendant, Tryon, aside in the bar, showed him the envelope with the money in it and asked him if he thought he deserved it and he answered, "Yes." Snoyer then gave the envelope to him and Tryon folded it and put it in his pocket. Immediately upon defendants leaving the restaurant, they were arrested which, as has been indicated, was on July 12, 1962.

This evidence was presented to the jury, the defendants moved for judgments of acquittal after the Government's case and also after their own case had been presented and both of these motions were denied. After summation of counsel, the case was submitted to the jury which rendered a verdict for the Government and against all three defendants. A motion for a new trial was denied on February 26, 1964, and this appeal followed.

The first reason advanced by the defendants for the new trial is that the charge of the court on entrapment was improper because (1) it did not make any reference as to whether or not there was any "predisposition" on the part of the defendants to commit the crime charged; (2) that the charge of the court with respect to Snoyer being a Government agent was insufficient, and, finally, that the court's use of the phrases "lawful entrapment" and "unlawful entrapment" was prejudicial to the defendant.

■ At the outset, it may be stated that a careful review of the record indicates plainly that there was no necessity for the court to charge with respect to entrapment. The record clearly shows that the unlawful scheme was conceived in the minds of the defendants, Schaeffer and Laverick, and materially aided by Tryon, and presented to Snoyer, and that everything thereafter done by Snoyer, in cooperation with the F.B.I. agents, was only taking advantage of an opportunity for wrongdoing that they presented and afforded.

■ While defendants, in their argument and brief, admitted that they do not set out effectively their objection to the court's charge on entrapment, they now assert that the court was in error in not using the specific word "predisposition" in setting forth the requisite state of mind that should obtain on the part of the defendants in any case of entrapment. However, it is plain that the trial court, in explaining the law of entrapment to the jury, was not bound to use any specific word and, while the court did not mention "predisposition", it did use phrases such as "implants in the mind of an otherwise innocent person", "already disposed * * *", as well as "already has the readiness and willingness to break the law", and similar phrases synonymous therewith. It is obvious that these phrases throughout the court's charge were interchangeable with the specific word "predisposition".

Furthermore, the court stated as follows:

"You are instructed that entrapment is present when the criminal design originates with an officer or agent of the Government and he implants in the mind of an otherwise innocent person the disposition to commit the offense and induces its commission in order to create the grounds for prosecution. You are further instructed that entrapment is not present when the criminal intent originates in the mind of a person already disposed to the commis-

sion of an offense, and the officer or agent of the Government does nothing more than afford that person the opportunity to commit the offense."

Furthermore,

"By way of summary as to this defense of entrapment, I charge you that the law recognizes two kinds of entrapment, unlawful entrapment and lawful entrapment. Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by a law enforcement officer to commit a crime, he is entitled to the defense of unlawful entrapment because, as I have mentioned, the law as a matter of public policy forbids a conviction in such a case, but on the other hand if a person already has the readiness and willingness to break the law, the mere fact that Government agents provided a favorable opportunity is no defense. This is lawful entrapment."

■■ With respect to the second assertion that the charge with respect to Snoyer being a Government agent was insufficient, it is likewise without foundation. It is obvious that a private individual may only be an entrapping party when an agency relationship exists between himself and the Government. The record herein displays no evidence to support any agency relationship between the Government and Snoyer at the time of the formation of the nefarious scheme and the court's detailed charge, concerning when entrapment is perpetrated by an officer or agent of the Government, was as full and complete as the record warranted. Additionally, a long and intensive cross-examination of Snoyer by defense counsel elicited nothing which could possibly be construed as making Snoyer a Government agent in any entrapment proceeding. This for the reason that Snoyer had no relationship with any Government official until after Schaeffer solicited the payment of money to him, and it is uncontradicted that Schaeffer arranged the meeting with Laverick at his home at which time the plan was perfected and which Tryon later on materially aided.

■ With respect to the third contention, while the adjectives "unlawful" and "lawful" entrapment might have been somewhat of an over-portrayal in describing the conditions requisite for entrapment, nevertheless, the thought clearly and carefully embodies that which is necessary and proper under the law. Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848; Accardi v. United States, 5 Cir., 257 F.2d 168; Park v. United States, 5 Cir., 283 F.2d 253; United States v. Romano, 2 Cir., 278 F.2d 202. Accordingly, it is obvious that the phrases "lawful entrapment" and "unlawful entrapment" comport with the language used by many appellate courts in describing entrapment and the trial court's charge with respect thereto was clear and sufficient.

The basis for the defendant's averment of entrapment, as has been indicated, is that Snoyer sought to lure the defendants into the wrongdoing in order to justify Consad's lack of success in obtaining the Government contracts. All of the facts, as we shall point out in connection therewith, were before the jury and Snoyer vigorously denied any assertion of allurement on his part, or that the telephone calls in July, previously adverted to, were designed with any thought of entrapment. These telephone conversations, in their entirety, show beyond a doubt that they belie any theory of entrapment on the part of Snoyer as a Government agent, but clearly point up only part of the strategem used to afford an opportunity for all of the three defendants to carry out their scheme of wrongdoing. As has been indicated above, the nefarious scheme was broached and implanted in Snoyer's mind by the defendant, Schaeffer, on June 6, 1962, when he stated that for a fee of 2% of the contract price, Snoyer could expect to receive the favorable approval at Monmouth which was necessary to the securance of the contract, all of which was aided and abetted by Laverick and Tryon, as herein

indicated, and, accordingly, it cannot be reiterated too often that all the F.B.I. did was to afford an opportunity through Snoyer for the defendants to commit the crime charged.

■ Another argument advanced by the defendant is that the charge of the court, in its summary, was one-sided and emphasized the Government's case to the exclusion of the defendant's case. Here, there was no objection to the court's charge with respect thereto at the close of the case and whatever warrant there is to this assertion must be found under the Plain Error Rule of Rule 52(b). There was denial by the defendants of all the allegations of the Government's witnesses and the contentions of both parties were properly laid before the jury, and a careful scrutiny of the record shows no prejudice in the court's charge, for it is abundantly clear that the court lent equal weight to both the evidence produced by the Government, as well as that produced by the defendants.

■■ The next objection raised by the defendant is that the court permitted certain questions to be addressed to the defendant, Laverick, which were prejudicial to him before the jury. One of the objected areas involved the cross-examination of Laverick with respect to his savings account and investments, while the other dealt with his ownership of a race horse. However a reading of the record shows that on direct-examination Laverick was questioned as to his financial situation and opened the door for the questions posed on cross-examination and were asked to test his credibility with respect to his financial situation and, accordingly, proper. The facts in this case pose nothing of the situation presented in Berger v. United States, 295 U.S. 78, at 84, 55 S.Ct. 629, 79 L.Ed. 1314, where the Government exceeded the bounds of cross-examination in large measure by permitting to go to the jury incompetent hearsay evidence. There was ample basis here for the cross-examination involved. Again here, it was the defendant's own objection which prevented the Government from proving the al-legations in connection with his large purchases of stock and a race horse and, accordingly, no prejudice resulted since the court, in its charge, said: "I further charge you that whenever the Court has sustained an objection to the question you may draw no inference from the wording of that question or speculate as to what the witness would have said if permitted to answer, nor can you assume that any party has objected to a question because that side expected the answer, if any, to be unfavorable." Accordingly, if any prejudice could have properly accrued to the defendant by this question, it was cured by the court's charge.

■ Finally, certain objections were raised as to the sufficiency of the indictment. However, an indictment should be construed broadly in favor of the Government after a verdict has been rendered thereon. Hagner v. United States, 285 U.S. 427, at 431, 52 S.Ct. 417, 76 L.Ed. 861. This rule is particularly applicable here where the defendant made no specific objection to the indictment by means of any pre-trial motion. However, objection is urged to the indictment here that it was insufficient, in that each count in Count I and II alleged the statutory offense in the disjunctive or alternative. Here again, counsel is urging, for the first time, this specific objection. The cases are unanimous in holding that merely technical defects are waived when no objection is made to them at trial. Rule 12(b) (2). What is really here adverted to is that the indictment is duplicitous, to which the Government answered that there is, in fact, no duplicity, nor did any ever exist, as there is no danger in the allegations that a conviction or acquittal of the defendants would fail to bar a subsequent criminal prosecution on the grounds of double jeopardy. The essence of the crime here charged is the receiving of the money, not the quid pro quo received or promised for that money, and where the statutes use the disjunctive to describe the alternate means of committing the same statutory offense and only one crime is charged, the means of commission are permissible.

United States v. Johnson, 5 Cir., 207 F.2d 314.

The other reasons asserted for a new trial are without merit.

The judgment of the District Court will be affirmed.