UNITED STATES of America

v.

Lawrence J. CONVERSANO and William P. Keohan.

Lawrence J. Conversano, Appellant.

No. 17372.

United States Court of Appeals Third Circuit.

Argued Feb. 4, 1969.

Decided July 15, 1969.

Richard C. Ferroni, Pirillo & Carabello, Philadelphia, Pa. (Anthony D. Pirillo, Jr., Philadelphia, Pa., on the brief), for appellant.

Donald Horowitz, Asst. U. S. Atty., Newark, N. J., for appellee.

Before KALODNER, GANEY and SEITZ, Circuit Judges.

## OPINION OF THE COURT

GANEY, Circuit Judge.

Defendant, Lawrence J. Conversano, and William Patrick Keohan were charged in a single two-count indictment with transferring and having in their possession and concealing counterfeited obligations of the United States, with intent to defraud in violation of 18 U.S.C. §§ 472 and 473. Keohan plead guilty to both charges while defendant plead not guilty. At his trial, defendant raised the defense of entrapment, took the stand and called Keohan, a co-defendant, as a witness. On the testimony presented by Secret Service Agent Kenneth E. Balge, the only witness called by the prosecution, the jury found defendant guilty on both counts, and the court, after denying post-trial motions, imposed concurrent sentences.

Although the Government has not raised the question, we must determine whether written notice of appeal was timely filed in this case in accordance with the Federal Rules of Criminal Procedure. The jury brought in its verdict on Tuesday, October 11, 1967. On the same day in open court, defendant's counsel applied for and was immediately granted, in lieu of the 7-day period provided for in Rule 33 of the Federal Rules of Criminal Procedure, a three-week period of time in which to file motions for judgment of acquittal and for a new trial. Interpreting the three-week period to mean 21 days, we conclude that it began on Wednesday, October 12, and ended with Wednesday, November 1, which was not a legal holiday. By letter dated November 2, one day after the three-week period, defendant's counsel requested an additional two weeks within which to file

the post-trial motions. He was notified by telephone on November 6 from the trial judge's chambers that his request was granted. On November 15, defendant filed his motion for a new trial. The motion was based on grounds other than newly discovered evidence, one of them being "The Court erred in denying Defendant's Motion for a directed verdict in acquittal."

In open court on March 19, 1968, immediately after he was sentenced, defendant was allowed to post an appearance bond in the amount of $5,000 pending an appeal.[1] The notation of the sentences was entered in the criminal docket two days later on Thursday, March 21. On April 1, by a written order, the district court denied defendant's motion for a new trial. The following day, April 2, the order was entered and defendant filed his notice of appeal in the district court. The notice provided:

> "The defendant was found guilty of the above offenses [Selling, transferring and delivering of counterfeited obligations of the United States; possession and concealing counterfeited obligations of the United States with intent to defraud.] and was sentenced to two four-year terms of imprisonment; said terms to run concurrently.

> "I, the above named appellant, hereby appeal to the United States Court of Appeals for the District of New Jersey from the above stated judgment." [2]

This notice of appeal was filed one day too late.

Rule 37(a) (2) of the Federal Rules of Criminal Procedure, effective at the time defendant filed his notice of appeal, provided in pertinent part:

> "(2) Time for Taking Appeal. The notice of appeal by a defendant shall be filed within *10 days* after *the entry* of the judgment or order appealed from. A notice of appeal filed after the announcement of a decision, sentence or order but before entry of the judgment or order shall be treated as filed after such entry and on the day thereof. If a *timely* motion in arrest of judgment or for a new trial on any ground other than newly discovered evidence has been made, an appeal from a judgment of conviction may be taken within 10 days after *the entry* of the order denying the motion * * *. A judgment or order is entered within the meaning of this paragraph when it is entered in the criminal docket * * *." (Italics supplied.) [3]

"It is well settled that 'the filing of a notice of appeal within the 10-day period prescribed by Rule 37(a) (2) is mandatory and jurisdictional.' United States v. Robinson, 361 U.S. 220, 224, 80 S.Ct. 282, 285, 4 L.Ed.2d 259 (1960); Berman v. United States, 378 U.S. 530, 84 S.Ct. 1895, 12 L.Ed.2d 1012 (1964)." United States v. Temple, 372 F.2d 795, 797 (C.A. 4, 1966), cert. denied 386 U.S. 961, 87 S. Ct. 1024, 18 L.Ed.2d 110. Also see United States v. Scarlata, 214 F.2d 807 (C.A. 3, 1954); 5 Orfield, Crim.Proc. Under Fed.Rules § 37.12.

Using the date of entry of the order denying the motion for a new trial, which was April 2, as the starting point, the filing of the notice of appeal was in time if the motion was timely filed. We think it was not. Rule 33 of the Federal Rules

---

1. The appearance bond was not made a part of the certified record on appeal until this Court requested the Clerk of the district court to do so on June 6, 1969.

2. The note was signed by defendant's counsel and underneath his signature appears the date of March 28, 1968, written in ink. However, the notice was stamped as being filed on April 2, 1968, at 8:30 a.m.

in the District Court. Counsel has offered no explanation to overcome the presumption of correctness of the stamp.

3. Rule 37 was abrogated December 4, 1967, effective July 1, 1968. The procedure for taking appeals in criminal cases is now set forth in Rule 4(b) of the Federal Rules of Appellate Procedure, effective July 1, 1968.

of Criminal Procedure, in pertinent part, provides:

> "The court on motion of a defendant may grant a new trial if required in the interest of justice * * *. A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 7 *days* after verdict * * * or within such further time as the court may fix *during the 7-day period."* (Italics supplied.)

Clearly, the trial judge had authority to grant the extension of time to three weeks in which to file the motion for a new trial inasmuch as the decision was made during the 7-day period immediately after verdict. But even if we assume factually that the letter dated November 2 was received by the trial judge and allowed by him as of that date, the second request for an extension of time was made and granted after the original three-week period had expired. We know of no rule which at the time would have given the district court authority to grant an extension of time other than the ground of newly discovered evidence. But defendant has not filed a motion based on that ground in this case.

 Using Thursday, March 31, 1968, the date of the entry of judgment in this case as the starting point, Monday, April 1, 1968, was the last day on which notice of appeal could ordinarily have been filed timely here.[4] According to the date of the official stamp on the notice of appeal, which we must accept as true in this case, the notice was filed on April 2, one day beyond the time allowed by the Rule. Thus were we to rely solely on the notice of appeal, this Court would be without jurisdiction to hear this appeal. How-ever, the condition of the appearance bond, which was executed and filed in the district court on March 19, 1968, recites that the defendant has filed an appeal to this Court and the appeal is now pending. We think the filing of the appearance bond containing the above recital may be deemed the equivalent of the filing of a written notice of appeal in the district court. See O'Neal v. United States, 272 F.2d 412 (C.A. 5, 1959). And although it was filed prior to the entry of the judgment, it is treated as having been "filed after such entry and on the day thereof." in accordance with the mandate of Rule 37(a) (2), *supra*.

On the merits of this appeal defendant contends that the trial court committed reversible error in (1) sustaining an objection to a question put to the prosecution's sole witness on cross-examination as to whether a person identified as James Seth O'Donnell was a paid informer of the secret service, and (2) charging the jury regarding the defense of entrapment and refusing to read to the jury his six requests for charge. For a proper understanding of the basis for defendant's contentions and theory of entrapment, a review of the testimony is necessary.

After the secret service learned that counterfeit money was available for sale, Balge, an undercover agent, posed as Ray Simpson, an assistant cashier of a bank in Washington, D. C. James Seth O'Donnell brought defendant, Keohan, to the bank and introduced him to Balge as a person who could possibly lead Balge to a source of counterfeit money. At a restaurant Balge told Keohan that he had embezzled $200,000 from a trust account and was anxious to replace it with counterfeit notes before the bank examiners made their audit. Keohan got in touch with one Theodore Kittelt and told him of Balge's predicament and his desire to

---

4. The 10-day period in which a notice of appeal could have been timely filed in this case began with the 22nd and ended with the 31st of March. Since the 31st was a Sunday, the period of time was extended to the following day, Monday, April 1, which was not a legal holiday. See Rule 45(a) of the Federal Rules of Criminal Procedure; 8A Moore's Fed. Practice (Cipes, Crim.Rules) ¶ 37.05.

buy fake money to cover up the embezzlement.

Later, in Baltimore, Maryland, Kittelt introduced defendant to Keohan. The latter informed defendant that O'Donnell had introduced him to a bank official in Washington who had an urgent need to replace an embezzled $200,000 and was willing to buy fake money for that purpose at the rate of $23 for every $100 face value of the fake bills. At first defendant did not want to get involved, but after Keohan and Kittelt assured him there would be no problems and because the bills from the hospital where his wife was a patient were mounting while he was unemployed and unable to pay them as they became due, he agreed to go along.

Keohan then told Balge that the fake notes would be delivered to him at a hotel in Newark, New Jersey, on Friday, May 27, 1966. On that day, Keohan, defendant, and Kittelt rode by automobile from Baltimore to Newark, a distance of approximately 185 riding miles. When they arrived at Newark in the afternoon, defendant and Kittelt were dropped off at a service station and instructed by Keohan to go to the mezzanine floor of a certain movie house in the city and wait for a telephone call, while Keohan went on to meet Balge at his room in the hotel. Later, defendant answered a public telephone at the movie house and when he informed the caller that Balge and Keohan were at a certain hotel, the caller told defendant to call Keohan and tell him to get Balge to move out of that hotel and into another before the deal would be consummated. Defendant relayed the message to Keohan at the hotel room where Balge was staying, but Balge refused to move on the pretext of fearing to be robbed of his money. Upon learning that Balge would not move to other quarters, the caller said that the deal was off. The caller was never identified.

Before heading back to Baltimore, defendant went to the hotel, on his own volition, to get Keohan. When he arrived there between eleven and eleven-thirty

p. m., and knocked on the door, Balge opened it, and the two met each other for the first time. Defendant asked for "Charlie", the name which Keohan was using. After telling defendant that Charlie was out of the room momentarily and inviting him in, Balge asked him why the deal was off. He responded by saying, "Look, we're not satisfied with this hotel. There was an arrest here previously involving our group and we don't want any more to do with this hotel. We want you to leave and go to another place." Then there were two versions as to what was said.

According to the testimony of Balge, on direct examination, he told defendant that he was refusing to move for the reason that he was unwilling to take his money out of the hotel where he was staying, and unless delivery was made there he was returning to Washington the next day. Despite this response, defendant tried to persuade Balge to check out of the hotel and go to the airport motel where the deal would be completed. When he refused to budge, defendant told him the deal was off. To which Balge replied that it was alright with him for he was being stalled around too long and was therefore going back to Washington. Then the defendant left the room. However, on cross-examination, Balge stated: "I tried to assure him [defendant] that this was not any setup where he was going to get arrested at all. All I was interesetd in is getting the counterfeit money, and if he had it, I was looking for delivery."

According to the defendant's testimony, Balge responded as follows: "I am not an agent. You must believe it. I am the vice-president of a bank and I got to have that money. I got to put it back before Tuesday or Wednesday." After being convinced that he was not an agent, defendant told Balge that he would try to do something for him. On the way out of the hotel, defendant met Keohan and told him that Balge had convinced him to go ahead with the proposition. When Keohan reassured him that Balge was not a Government agent, de-

fendant returned to the movie house and obtained a sample bogus ten dollar bill from under a lounge pillow on the mezzanine floor, which he had previously been told to do by the caller. He returned to the hotel around midnight and showed it to Balge who replied that it was alright and to get the rest for him so that he could put it in the bank before the examiners found out about the loss. Defendant again told Balge that the supplier of the fake bills wanted him to move to another place before completing the deal, but Balge steadfastly refused to budge. Defendant then departed and obtained a room for the night in the same hotel.

The following morning, Saturday, May 28, defendant went to Balge's room and after he again refused to move, defendant told him in Keohan's presence that the deal would go through at the hotel and that he would pick up the bills, having a face value of $60,000 and wrapped in a brown bag, from a public trash receptacle around the corner from the hotel. He left and then returned with the package. Balge went through the formality of counting the bills and then asked defendant and Keohan to follow him downstairs to get the real money to pay defendant. As they were doing so, Balge thumped the door of the room next to his, wheeled around, identified himself as an agent and told them they were under arrest. The other agents who were standing by in the next room came out and assisted in the arrest.

■ Regarding his first point, defendant argues that it was of the utmost importance to the defense of entrapment to obtain the relationship between the Government agents and O'Donnell who was the first link in the chain that induced defendant to take part in the scheme as outlined at the trial. The

relationship of O'Donnell to the Government, whether as a paid informer or agent, was immaterial in this case. See Nordeste v. United States, 393 F.2d 335, 338–339 (C.A. 9, 1968), cert. denied 393 U.S. 878, 89 S.Ct. 178, 21 L.Ed.2d 150. There was no evidence that he ever communicated with the defendant. The mere fact that a person is a link in a chain of people through whom a defendant ultimately meets up with an agent does not make that person an entrapper. Additionally, there was no evidence in the record that Koehan or Kittelt were agents of Balge's, or of the Government's, nor were they in his employ as they deemed the story of Ray Simpson as an embezzler to be true.

■ Concerning defendant's second contention, on charging the jury regarding the defense of entrapment and refusing to read to the jury his requests for charge, the record discloses that at the outset of his trial his counsel informed the court that defendant was not denying that he had committed the acts and in the frame of mind set forth in the indictment, but was relying on the defense of entrapment. In his very brief opening address defense counsel told the jury that his case would differ slightly from those which they probably sat upon during their term as jurors in that defendant's defense is based on the theory of entrapment and for that reason defendant had plead not guilty to the indictment and not because he did not have possession of the money or that he didn't know it was counterfeited. The trial judge told the jury that entrapment was a valid defense to an accusation in an indictment and defined entrapment in the language of United States v. Clark, 343 F.2d 90, 92 (C.A. 3, 1965).[5] He also informed them that the secret service is charged with the duty of making *investi-*

---

5. In the cited case, this Court, speaking through Judge Kalodner, said: "Entrapment occurs * * * when the criminal design originates with the officials of the government and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its

commission in order that they may prosecute. * * * To determine whether entrapment has been established, a line must be drawn between the trap for the unwary and the innocent and the trap for the unwary criminal."

*gations* and following leads and employing such methods, under the circumstances, as well enable them to prevent or reduce the influx of counterfeit money in circulation as genuine legal tender. He left it to the jury to determine from the testimony on both sides whether the defendant was entrapped. Although he charged that the burden was on the prosecution to prove beyond a reasonable doubt that defendant was guilty of each element of the crime for which he was accused, he did not tell them that this same burden was also on the Government to establish that entrapment did not occur. However, no point for charge was submitted concerning it nor was any objection made to the charge of the court at the close thereof, and we see no reason, under these circumstances, to invoke the Plain Error Rule, Federal Rule of Criminal Procedure 52(b), and, accordingly, absent any objection by the defendant, no substantial rights of his were affected as to warrant consideration without such objection. Lopez v. United States, 373 U.S. 427, 436, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); Reid v. United States, 334 F.2d 915–917 (C.A. 9, 1964); Martinez v. United States, 300 F.2d 9–10 (C.A. 10, 1962).

While it has been held that the burden is on the Government to prove beyond a reasonable doubt that the defendant was not entrapped when that defense is properly raised, United States v. Landry, 257 F.2d 425 (C.A. 7, 1958),[6] it also has been held that the trial court's refusal to so charge upon request is reversible error, Pratti v. United States, 389 F.2d 660 (C.A. 9, 1968), but we reiterate that since no objection to the charge on this point was made, we, therefore, must deem the general instructions given on the burden of proof to be broad enough to have covered the issue of entrapment. United States v. Salas, 387 F.2d 121 (C.A. 2, 1967).

Defendant objected to the trial judge's "statement" and "explanation" of entrapment but offered no suggested improvement except the adding of his six points for charge which the judge had refused to read to the jury. He also objected to the trial judge's use of the term "investigation" in describing the duty of the secret service as prejudging his theory of entrapment. The trial court's overruling of these objections is the basis for defendant's second point.

In view of the defense raised by the defendant, the sole issue in the case was whether he was entrapped by persons acting on behalf of the Government into committing the acts set forth in the indictment. There was no real need to have submitted the case to the jury as though it were an ordinary trial for violations of sections 743 and 742 of Title 18, U.S.C. However, no harm was visited upon defendant by charging in this fashion since it gave him an additional opportunity to be found not guilty, for, despite the fact that counsel admitted the accusations in the indictment, the jury was required by the trial judge to determine the very issues which defense counsel said were no longer in the case.

Defendant did not file a motion for judgment of acquittal at the end of all the evidence, as is permitted by Rule 29 of the Federal Rules of Criminal Procedure. Instead, he included in his requests to charge the following: "6. Direct verdict of acquittal." Additionally, one of the grounds set forth in his motion for a new trial is, "The Court erred in denying Defendant's Motion for a directed verdict in acquittal." He has assigned the trial judge's failure to read his requests to charge under the second point as grounds for this appeal. Though motions for directed verdicts have been abolished by the criminal rules, we shall treat the above quoted request as though it were a motion for judgment of acquit-

---

6. But see United States v. Bishop, 367 F.2d 806, 807 (C.A.2, 1966), where the Court held that the accused bears the burden of proving that the agent induced him to commit the offense charged in the indictment, while the Government must prove beyond a reasonable doubt that the accused was ready and willing without persuasion from the agent to commit the offense.

tal at the end of all the evidence and that it was denied by the district court both at the time it was submitted and in the court's order denying the motion for a new trial.

■■ Defendant was not entitled to judgment of acquittal on the grounds that the evidence showed as a matter of law that he was entrapped; at most, it presented a jury question. The parts played by Keohan or Kittelt did not amount to entrapment. United States v. Laverick, 348 F.2d 708 (C.A. 3, 1965). The counterfeiting of United States currency and trading in them is done in secret. It is the job of the secret service to flush new practices to the surface where they may be detected. One method, as used in this case, is to create a fictional demand for forged money and let it be known to those who would willingly traffic in species of that kind. This is permissible. If either Keohan or Kittelt were acting on behalf of the Government there might be merit to defendant's request for judgment of acquittal. The Government did not make Keohan its agent merely by using him as a courier. Keohan, called as a witness by the defense, testified on cross-examination that until he was arrested on May 28, 1966, he never knew Balge was a secret service agent. He also testified on direct examination that he got in touch with Kittelt because he believed that Kittelt could lead him to a source of counterfeit money since he had been involved in counterfeit money transactions on prior occasions.

■ The conversations between Balge and the defendant will not aid him. By his own admission he was predisposed to commit the crimes for which he was indicted or was willing to grasp at the opportunity to fulfill his preconceived intent to commit those crimes albeit he had never been involved in a counterfeit money transaction before. Therefore, defendant must argue that he abandoned his original design and that thereafter Balge induced him to execute it. But the issue of abandonment was never submitted to the jury nor was the trial judge expressly requested to ask the jury to consider that question. He cannot validly complain of that omission here. See Marbs v. United States, 250 F.2d 514, 516–518 (C.A. 8, 1958). Balge's testimony did not disclose that defendant abandoned his original intention, as, at best, the "deal" was declared off only because defendant wanted a change of locale for the delivery of the counterfeit money and not because of any abandonment of his intent to commit the crime. Therefore, any change of heart on his part would have to be revealed by the defendant and the truth of any such revelation would have been a jury question. If the story related by defendant was believed by the jury, a person, whose identity was not revealed, made the decision to postpone the carrying out of the scheme solely because Balge declined to move from the hotel where one of the gang was claimed to have been arrested in the past year. True, Balge candidly admitted that he tried to assure defendant at the hotel that the scheme was not a setup. Defendant said on the witness stand that he told Balge in response to this assurance that he would try to help him. Later, he delivered the bundle of fake bills which raised the permissible inference that he persuaded the unidentified person to supply the bogus bills without which there could not have been any delivery. Moreover, the assurance given by Balge was not of a degree which, in our opinion, required the trial judge to have submitted the issue of abandonment to the jury. Cf. United States v. Klosterman, 248 F.2d 191, 69 A.L.R.2d 1390 (C.A. 3, 1957).

■ The only question remaining is whether there was reversible error in the instructions to the jury. The trial judge properly defined entrapment to the jury. He did not err in refusing to read any of defendant's six requests to charge. All but No. 4 were in effect requests for judgment of acquittal on the evidence. We have ruled he was not entitled to that. Request No. 4 was defendant's definition of entrapment quoted from

Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). Although it was a correct version, the trial judge was not required to charge in those words. The use of the word "investigation" by the trial judge, as we have indicated previously, was a reasonable explanation to the jury of the duties of a secret service agent.

Accordingly, the judgment of conviction and sentence will be affirmed.