UNITED STATES of America
v.
Charles HARRIS and Harold Young.

UNITED STATES of America
v.
Alvin E. YOUNG et al.
Crim. Nos. 73–45, 73–193.

United States District Court,
E. D. Pennsylvania.
Oct. 26, 1973.

Thomas J. McBride, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Robert F. Simone, Thomas C. Carroll, Jack M. Myers, Joseph Alessandroni, Jr., Paul Yermish, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION

BECHTLE, District Judge.

All of the above defendants, except James H. Simmons,[1] were tried on the two indictments consolidated for trial charging violations of various of the narcotic laws of the United States and, after three weeks of trial, were found guilty by the jury on each count that was permitted to go to the jury.[2]

All convicted defendants have moved for judgment of acquittal pursuant to Fed.R.Crim.P. 29 or, in the alternative, for a new trial pursuant to Fed.R.Crim. P. 33. Each of the defendants has raised a variety of grounds in support of their respective motions, which in many cases are identical. All motions outstanding in respect to all defendants will be denied for the reasons enumerated in this Opinion.

### HISTORY OF THE CASE

On November 13, 1972, the United States Department of Justice filed with the Clerk of the United States District Court for the Eastern District of Pennsylvania an application for a Court Order in accordance with the provisions of

---

1. Defendant James H. Simmons was severed and is to be tried at a later date. The circumstances supporting the Court's Order of severance are covered in other parts of the Court's Opinion.

2. Count III of indictment number 73–193 was withdrawn from the jury when the Court granted the motion of Alvin E. Young for a judgment of acquittal on the ground that the Government had failed to meet its burden of proof that Alvin Young was guilty of being a principal in a continuing criminal enterprise in violation of Title 21 U.S.C., § 848.

Title 18, U.S.C., § 2510, seeking authority to cause the installation of a wiretap on the telephone registered as number (215) 879–5424 in the name of Alvin E. Young and located on premises 5411 Arlington Street, Philadelphia, Pennsylvania. The probable cause offered in support of this request was to the effect that Alvin Young and others were suspected of being engaged in the business of large-scale heroin purchase, process, distribution and sale in the New York and Philadelphia areas. Following a hearing before the Honorable J. William Ditter, Jr., of the United States District Court for the Eastern District of Pennsylvania, on November 13, 1972, the application was approved; the interception was activated and continued until November 29, 1972, during which period of time Federal agents of the Bureau of Narcotics and Dangerous Drugs (BNDD), under the supervision of Special Agent James Banister, monitored through standard listening and taping procedures the telephone calls that were incoming and outgoing from the telephone line in question.[3]

The Government's principal evidence consisted of the testimony of Linda Johnson, an informant and also an unindicted co-conspirator; a real estate agent from Willingboro, New Jersey; several Philadelphia Police Officers and agents of the BNDD, all assigned to the Office of Drug Abuse and Law Enforcement (ODALE); six telephone conversations, intercepted in accordance with the Court-approved electronic surveillance; and, 14,000 bags of heroin seized from a 1966 black Oldsmobile. There were also several stipulations, including the stipulation that the 14,000 bags that were seized in fact contained heroin and that 15 calls were made from a telephone registered to Alvin E. Young to the Hotel Dash on Lenox Avenue in the City of New York during June and July of 1972. The informant witness, Linda Johnson, testified that she first met Alvin E. Young in April, 1972. She and Alvin E. Young, together with all of the defendants, had on four or six occasions driven to the City of New York for the purpose of purchasing large quantities of loose heroin. She indicated that on one occasion in August of 1972 she drove to New York with these men and, when they arrived there, Alvin E. Young handed her $72,000 in a package which she took with her when she and Alvin E. Young went into the Dash Hotel. The money was counted in her presence and used to purchase two kilos of heroin, which Linda Johnson placed in a large pocketbook. She was thereafter told by Alvin E. Young to return to Philadelphia on a bus in the company of defendant Robert Green. She testified she made two or three such trips and on each occasion, on return to Philadelphia, she would visit a different house where all of the defendants and other unidentified persons would meet for the purpose of adulterating, cutting, bagging, packaging, and readying the heroin for sale and distribution in small glassine bags. She testified that, during this period of time and for several years before, she had been befriended by Philadelphia Police Officer Grant Beasley who was on the Philadelphia Police Department Narcotics Squad and who sought and received information from her from time to time on a regular basis in respect to criminal activities, including narcotics sales, for which she was paid money by Officer Beasley.

On January 2, 1973, while Officer Beasley was in Linda Johnson's home, he listened in on a call, with Linda Johnson's permission, between her and Alvin E. Young. The substance of the call was to ask if "Sonny" (defendant Harvey Johnson) was there and to ask if Linda Johnson's car could be used the next day, January 3, 1973, for a delivery of narcotics. Officer Beasley reported this overhear to his superiors at ODALE and a ten-man surveillance team was thereafter formed to meet the following morning at 7:00 a. m. to begin

---

3. The Court Order was later held to be a valid Court Order under the statute after a separate pretrial evidentiary hearing before the issuing Judge was held on June 19, 1973.

surveillance near Linda Johnson's home on North Philip Street.

At 7:00 a. m. on January 3, 1973, ten agents, operating under the authority of Chief Investigator Edward R. Cassidy of the BNDD, assembled at the headquarters of ODALE at 308 Walnut Street, Philadelphia, Pennsylvania, for the purpose of preparing a surveillance plan to take place in the several blocks surrounding the vicinity of premises 2119 North Philip Street, Philadelphia, the residence of Linda Johnson. The ten officers were from the Philadelphia Police Department and assigned to ODALE, in keeping with a joint Federal-state drug law enforcement program approved by the United States Congress, accepted by the state and executed under Federal supervision. Each of five unmarked, civilian-type automobiles containing two officers were scattered in the vicinity at five prearranged locations, each with radio communication capability to and from each other. The primary object of the surveillance was a 1966 black Oldsmobile which was seen in the vicinity by several of the surveillance officers. Defendants Charles Harris and Harvey Johnson were also seen individually at separate nearby locations during the one-hour surveillance.

The 1966 black Oldsmobile left the vicinity, but could not be followed by any of the surveillance vehicles due to heavy traffic. The surveillance vehicles were then directed by Agent Cassidy to leave the area and go to the community of Willingboro, New Jersey (approximately 25 miles distant), and assume prearranged surveillance positions at two residences in that community, to wit, 98 Manor Lane and 4 Tempest Lane, properties which Alvin E. Young was believed to have either a residence or an ownership interest in. The agents who went to the Tempest Lane address were satisfied that there was no activity of any kind there, and they joined the other agents who had concentrated their efforts in and about the vicinity of 98 Manor Lane. Chief Investigator Cassidy and Sergeant William Baron of the Philadelphia Police Department, occupying one car, drove past 98 Manor Lane and, in doing so, passed by Alvin E. Young and another unidentified male who were standing in the street. The officers assumed a surveillance post while seated in their car at a point some 250 feet away and beyond certain other properties containing shrubbery where, with the use of field glasses, the front of premises 98 Manor Lane was visible. In such position, they saw the following events:

(1) Charles Harris, Harold E. Young, and an unidentified Negro male left the house about 11:00 a. m.

(2) Charles Harris walked to a yellow vehicle parked on Manor Lane, opened the trunk and reached in, bent over and walked in such a manner as permitted the surveillors to conclude that he had an object in his hands, although they did not see the object. He went to the 1966 black Oldsmobile which was the same one that had been under surveillance earlier near 2119 North Philip Street, Philadelphia, and he appeared to place the object in the trunk of that car.

(3) The 1966 black Oldsmobile, driven by Charles Harris, left and was followed by a 1967 Pontiac driven by defendant Harold E. Young. The surveillance team followed. The defendants' cars proceeded south on New Jersey Route 130, which parallels the Delaware River, crossed the Tacony-Palmyra Bridge into Philadelphia, and proceeded over Levick Street, down Roosevelt Boulevard to the ultimate destination at 15th and Louden Streets, where both of the automobiles came to a parked position a short distance apart. Both drivers left their vehicles and waited on the sidewalk. During this period of travel, the five Government vehicles, alternating their surveillance positions, closely followed those vehicles over the entire route to the place where both vehicles stopped.

During the trip from Willingboro, New Jersey, the black Oldsmobile and the Pontiac followed each other closely, with the black Oldsmobile always in front. On one occasion, the two vehicles

stopped at a gas station and Charles Harris was seen leaving the black Oldsmobile and walking back to the Pontiac to converse with the driver of the Pontiac, Harold E. Young. On two other occasions, when the black Oldsmobile barely made a green light, it proceeded through the intersection, stopped on the other side, and waited until the Pontiac was able to proceed with the next green light.

Charles Harris and Harold E. Young were arrested on the sidewalk at 15th and Louden Streets. Charles Harris stated to arresting officers that he did not know anything about the 1966 Oldsmobile in that he had "arrived at the scene in a taxi cab."

Other than the foregoing, neither of these two defendants made a statement. They were taken to ODALE headquarters, given their warnings, and thereafter at 5:30 p. m. a search warrant for both vehicles was prepared and executed before Judge John J. Poserino, a State Court Judge presiding for such purposes at 5:30 p. m. at the Philadelphia Police Administration Building. At 7:30 p. m. that evening, both cars were searched. Found in the trunk of the Oldsmobile were 14,000 bags of white substance which the defendants later stipulated was heroin.

On January 23, 1973, the Federal Grand Jury returned indictment number 73–45 against Charles Harris and Harold E. Young, charging Charles Harris in Count I of possessing a controlled substance (heroin) for purposes of distribution or sale, in violation of 21 U.S.C. § 841. Count II of that indictment charged Harold E. Young with aiding and abetting Charles Harris in possessing the controlled substance with the intention of sale and distribution.

On April 3, 1973, the second indictment (number 73–193) was returned by the Federal Grand Jury, and it contained three counts. The first count charged the two defendants already under indictment, together with four others, with a conspiracy to possess with intent to deal and to distribute quantities of heroin, in violation of 21 U.S.C. § 841. The second and third counts of this second indictment were against Alvin E. Young only and charged him in Count II with the use of a telephone in connection with a drug transaction (21 U.S.C. § 843(b)) and in Count III with being a principal in a continuing criminal enterprise involving narcotics (in violation of 21 U.S.C. § 848).

The charges relating to heroin possession contained in the earlier indictment against Charles Harris and Harold E. Young were also set forth in the conspiracy count of the second indictment as an overt act.

The Government authenticated electronic surveillance by introducing the record of the Court Order and its approval by the Honorable J. William Ditter, Jr., and also produced as identifying witnesses Linda Johnson and Officer Grant Beasley, who both had previously heard Alvin E. Young and Harold E. Young talk in person and on the telephone. Both of these witnesses had indicated that they had talked to Alvin E. Young and that they had listened to the tapes and that, in their opinion, the voices were of Alvin E. Young or Harold E. Young and, in some instances, unidentified. They compared the tapes that they had heard with typed transcripts prepared by the Government from the tapes, and the witnesses then testified that the designation on the transcripts of various statements made by either Alvin E. Young or Harold E. Young was an accurate representation of what each of those persons had stated on the tapes. Both identifying witnesses testified they had never seen the transcripts before but identified the voices on the basis of their ability to perceive the sound and quality of the taped voices with the actual voices of these two defendants that they had previously come to know. The tapes were played for the jury under the instructions that they were to consider the voices they heard on the tapes as the evidence and not the transcripts that were simply to be used as a guide by the jury

in following the tapes. The calls indicated that Alvin E. and Harold E. Young spoke several times, and Alvin E. Young had spoken to unidentified persons several times. In summary, the incriminating excerpts from the telephone calls could be summarized by stating that Alvin E. Young indicated soon after the tap was authorized that he knew he was being wiretapped; he referred to the use of "b's," to which the Government produced expert testimony that this term in the narcotics trade meant "bundles" which, in turn, had been described as a term used for a package of 25 glassine bags of heroin. There was also a reference to the fact that Alvin E. Young realized he was being followed by Federal narcotics agents; several other common references in the narcotics trade were used by Alvin E. and Harold E. Young, and there were excerpts of episodes of conversation where intelligible words and phrases were used by Alvin E. Young but which were responded to by Harold E. Young in intentionally formed but unintelligible responses that were sufficiently loud and clear to justify the jury in concluding that the responses were in a form of code language. There were excerpts to the effect that certain "people got busted with 56 'b's' " which was offered to show that Alvin E. Young's knowledge that 56 "bundles" of heroin were found on persons arrested.[4]

None of the defendants took the stand in their own behalf. Some of the defendants offered evidence; others did not. Defendant Robert Green offered as a witness the stepmother of Linda Johnson, who testified as to the events surrounding a charge of assault with intent to kill and aggravated assault and battery that had been made against Linda Johnson during an altercation in the stepmother's home in 1972. He also called Assistant District Attorney Taras Wochok, Esq., who was the Philadelphia County equivalent of the Assistant United States Attorney functioning on the state side of the joint Federal-state law enforcement team operating under ODALE. Defendant Harold E. Young produced hospital record evidence concerning Linda Johnson's hospitalization for drug addiction; Harold Joseph, a commercial photographer, who testified that he had taken certain pictures on June 11, 1973, in the presence of Mr. Yermish, his attorney, at premises 98 Manor Lane; and Professor Korbobo, who testified that it was his opinion from observing the photographs and identifying the various types of shrubbery that certain of those plantings, between the premises 98 Manor Lane and the point where the surveillance agents testified they observed certain events, were of the species that would have made visibility difficult if not impossible on January 3, 1973. Charles Harris called two Philadelphia detectives who testified as to their experience with Linda Johnson as a police informant. Neither Alvin E. Young nor defendant Harvey Johnson offered any evidence.

The principal thrust of all defendants was to destroy the credibility of the Government's witnesses and primarily Linda Johnson. The cross-examination of the Government's witnesses was extensive in this respect. The defense showed that Linda Johnson for a number of years had been a narcotic addict, a heroin addict, a prostitute, an informant, a person who had 14 or 15 arrests, and who was testifying because she expected to receive lenient treatment or recommendations of lenient treatment for her convictions from a State Court sentence. Defendant suggested that her previous ability to stay out of jail was a direct consequence of her being an informant for law enforcement officials and that law enforcement persons were responsible for her narcotic addiction and that she was dependent upon them and, therefore, was inclined to lie. De-

4. Prior to the introduction of any electronic surveillance evidence, the Court held a hearing outside the presence of the jury at which all defendants and all counsel were present. The results of that hearing was that the Court reduced the calls to be permitted into evidence to six. See, N.T. pp. 9–3 to 9–59.

fense also attempted to show that Officer Grant Beasley similarly was inaccurate in his testimony, was unreliable, and was in collaboration with Linda Johnson in furnishing false testimony.

The jury disagreed with the defendants' theories and concluded that the Government had made out its case beyond a reasonable doubt against all defendants and returned a guilty verdict on all counts accordingly.

## CONSOLIDATION OF THE TWO INDICTMENTS FOR TRIAL

Pursuant to Rules 8(b) and 13 of the Fed.R.Crim.P., the Court consolidated criminal numbers 73–45 and 73–193 and joined the five defendants in trial, in that the defendants were "alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed.R.Crim.P. 8(b).[5] Defendants now contend that the trial court erred in consolidating the two cases for trial.

■ The Court properly exercised its prerogative by consolidating criminal numbers 73–45 and 73–193 for trial. A conspicuous example of the correctness of the consolidation order lies in the fact that proof of the charges in 73–45 is actually proof of one of the overt acts charged in 73–193. Specifically, criminal number 73–45 charged Charles Harris with unlawful possession with intent to distribute about 14,000 bags of heroin and charged Harold Young with aiding and abetting the possession by Charles Harris. The possession and transporta-

tion of this quantity of heroin was alleged by the Government to be a substantial overt act done in furtherance of the conspiracy charged in criminal number 73–193.

In addition to the two-fold introduction of expert and empirical evidence, two separate trials would have resulted in the complete duplication of both Government and defense witnesses. The two indictments were properly consolidated.

## DEFENDANTS' ARGUMENTS AS TO SEVERANCE

Defendants Harvey Johnson and Robert Green allege as an additional basis for the granting of a new trial that the Court committed error in denying their respective motions for severance. Defendant James Simmons was severed from the conspiracy indictment for trial purposes for reasons which the Court concludes were justified.[6] Motions for severance were submitted in writing prior to trial and were renewed orally throughout the course of the trial. Exercising the discretion afforded the trial judge, the Court denied the defendants' motions for severance. See, Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); United States v. Wolfson, 289 F.Supp. 903 (S. D.N.Y.1968).

■ In order to be entitled to a new trial on the ground that the trial court abused its discretion in denying a motion for severance, defendants must now demonstrate with precision that they were prejudiced by the joint trial to such an

5. Rules 8 and 13 must be read conjunctively in order to determine whether consolidation is available. Fed.R.Crim.P. 13 authorizes the Court to consolidate two or more indictments if the offenses and the defendants could have been joined in a single indictment. The respective tests for joinder of offenses and defendants are outlined in Rules 8(a) and 8(b).

6. When this case was called for trial, three of the defendants' counsel were assigned to important homicide cases in the Philadelphia Common Pleas Court. Because of the diffi-

culty in assembling experienced and busy criminal counsel and because of certain outstanding rules between the Federal Court and the State Court, a conference was had between the Chief Judge of the Federal Court and the President Judge of the Common Pleas Court; and the dispute was resolved by the Federal Court agreeing to release the most important of those homicide case attorneys (Simmons' attorney) in return for the release by the State Court of the other two attorneys, who then appeared before the District Court to defend their clients. See, N.T. pp. 1–5 to 1–8.

extent that they were denied a fair trial altogether. United States v. De LaRosa, 450 F.2d 1057, at p. 1063; United States v. Wolfson, *supra,* 289 F.Supp. at p. 908.

Defendant Harvey Johnson cites the complexity of proofs, the number of defendants, the diminution of the quantity of peremptory challenges otherwise available to defendant, and the possibility of antagonistic and inconsistent defenses as grounds for the granting of his motion for severance.

■ The Government correctly contends that a severance should not have been granted, because all of the defendants were allegedly involved in an integrated, highly organized scheme of purchasing, packaging, and distributing heroin and that the facts tending to establish the guilt of each defendant were essentially identical. In retrospect, overwhelming evidence adduced at trial in fact established the existence of such an unlawful conspiracy and significant participation in same by all the named defendants. A severance of one or more of the defendants would have compelled the Government to conduct several trials involving substantially the same evidence and the same witnesses, all introduced to prove the existence of, and participation in, one conspiracy.

The court in *Wolfson,* at p. 908, stated that defendants indicted together should be tried together and that this general rule is particularly appropriate when the conspiracy may be proved against the defendants by the same evidence resulting from the same or a similar series of acts.

The reasoning and decision in *Wolfson* is certainly applicable to the facts in this case. The Government proved the existence of the conspiracy by introducing evidence of a series of unlawful acts engaged in by all of the defendants at one time or another in pursuit of their common conspiratorial objectives.

"In weighing the competing factors under Rule 14 regarding severance, the trial court must evaluate the alleged factual and legal compactness of the consol-idated trial and the Government's interest in judicial economy with the potential prejudice to any of the defendants." United States v. Harris, 458 F.2d 670, 673 (5th Cir. 1972). This Court is unable to state that the offenses involved and the evidence presented were so complex so as to preclude a separate and intelligent evaluation of the evidence as it applied to the several charges that had been made against the five defendants individually.

■■ Moreover, to sever the consolidated trial and to require two or more separate trials would impose a tremendous financial and physical burden on the resources of our judiciary and the supporting agencies operating in connection with the criminal justice system. The generalized prejudice alleged by the defendants does not justify the imposition of such a burden. "To demonstrate prejudice under Rule 14, defendants must *demonstrate* something more than the simple fact that they sat together at a joint trial for conspiracy." United States v. Harris, *supra,* at p. 673. (Emphasis added.) Similarly, the fact that the Government introduces considerably more damaging evidence against one defendant than the others does not entitle any of the defendants to a separate trial.

In summary, there is nothing in the record that dictates reversal because of any confusion or injustice arising from the joint trial.

## EXCLUSION OF JURORS BECAUSE OF RACE

■ Defendant Harvey Johnson seeks a new trial on the additional grounds that the Government systematically excluded members of the Negro race from the petit jury by exercising four of its six peremptory challenges to strike blacks from such jury. A claim of systematic, discriminatory exclusion of Negroes from the trial jury cannot be established by proof of the Government's striking of Negroes in any one case. United States v. Pearson, 448 F.2d 1207, 1213 (5th Cir. 1971).

In the recent case of United States v. Corbitt, 368 F.Supp. 881 (E.D.Pa.1973), defendants claimed that the prosecution's striking peremptorily all five Negro members of the jury panel denied them a fair trial and a jury of their peers. That court dismissed defendants' claim, observing that:

". . . the thought processes of the prosecutor in deciding how he will exercise these [peremptory] challenges is beyond the Court's inquiry, and the resulting composition of the jury in a particular case does not establish impropriety." (United States v. Corbitt, p. 886.)

See also, Swain v. Alabama, 380 U.S. 202, 220, 85 S.Ct. 824, 836, 13 L.Ed.2d 759 (1965); United States v. Carlton, 456 F.2d 207, 208 (5th Cir. 1972).

Defendant's motion on this ground will be denied.

## DENIAL OF MOTION FOR DISCOVERY OF PREMISES 2119 North Philip Street

If it were necessary to summarize the reasons why the denial of this motion was proper, it would be fair to say that the denial resulted from a lack of appreciation by counsel with the need to comply with Local Rules of Criminal Procedure coupled with a similar lack of appreciation for the limitations of a xerox machine. The two Local Rules of Criminal Procedure involved on this point are Local Rule 9, providing for pretrial discovery, and Local Rule 11, governing pretrial motion practice.[7]

Local Rule 9 is fashioned after Federal Rule of Criminal Procedure 16, which is designed to provide the maximum scope of pretrial discovery for defendants under a system that encourages and requires the process to be initiated and managed by counsel rather than the Court, except when all negotiation fails. When this occurs, Local Rule 9 prescribes at paragraph (b) that disappointed counsel file a motion under Local Rule 11 specifying the fact that the conference was held, a statement that agreement could not be reached, and *a request for a hearing before the Court to resolve the dispute.* (Emphasis added.)

Rule 11 governs pretrial motion practice (for discovery Rule 9, as well as all other pretrial motions), and it simply provides for the moving party to furnish five days' prior notice to his adversaries of an intention to file a motion with a supporting legal memorandum. On the designated day for filing, if the adversary party seeks to oppose the motion, he has but to file his memorandum in opposition; if he chooses not to oppose, he need not file anything, which would then signal the Court to treat the motion as unopposed. With the foregoing procedural backdrop in mind, the following events transpired in this case on defendant's motion to inspect the subject premises:

On April 24, 1973, counsel for the defendant and the Assistant United States Attorney convened pursuant to Rule 9 for the purpose of pursuing the defendant's discovery rights under that Local Rule. While a great deal of progress was made at that meeting, and substantial materials were provided or agreed to be provided by the Government, several items could not be agreed to, one of which being the demand by this defendant for the right to enter upon premises 2119 North Philip Street for the purpose of inspecting the telephone located in that property as well as to determine that telephone's exact location and the telephone number. On May 2, 1973, the defendant filed six separate motions seeking a variety of relief (relief from prejudicial joinder, suppression of evidence, bill of particulars, disclosure of informants' identities, motion for transcripts and of notes of testimony, and his motion under Rule 9 in respect to unresolved discovery demands). None of these motions were filed in accordance with Local Rule of Criminal Procedure 11 and, accordingly, on May 10,

---

7. See Appendix for full text of Local Rules of Criminal Procedure 9 and 11.

1973, the Court entered its Order denying all of the motions on that ground. Fifteen days later, on May 25, 1973, the Government (correctly anticipating that defendant would refile his motions in accordance with the requirements of Local Rule 11) filed its answers and response to the defendant's motions, including the motion seeking to visit premises 2119 North Philip Street. The Government had apparently recanted in its previous refusal to furnish information about the telephone and, in its answer at paragraphs 5 and 6, did disclose the location of the telephone as well as the telephone number. In respect to access to premises, it indicated that it had no control of the premises and that it suggested that defendant attempt to procure information as to who was in control of the premises so that access could be attempted and, if that did not succeed, ". . . *bring the matter before the Court.*" (Emphasis added.)

Defendant contends that, though the Government's answer was filed, a copy was not served upon him. His letter to the Assistant United States Attorney of June 6, 1973,[8] discloses, however, that he was aware during the week of May 28, 1973, that the Government had indeed filed an answer with the Court. Presumably, therefore, sometime during that week he could have either asked the Assistant United States Attorney what the answer stated or he could have visited the Court and examined the answer that had been filed. Whether either of these things was done is unknown, but it apparently would have made no difference because the following week, on June 11, 1973, four days before this case was called for trial, the defendant refiled all of the motions that had been previously filed on May 2 and which had been denied by reason of lack of compliance with Rule 11. Rather than conform the motions to the events that had transpired between the original filing and the date they were refiled (June 11,

1973), counsel for the defendant apparently removed his office copies of the motions, xeroxed them, and simply refiled the May 2, 1973, motions on June 11, 1973. These motions were filed in accordance with Rule 11. However, because they had simply been copies of the former motions, they continued to be defective under discovery Rule 9 in that they did not request a hearing and, furthermore, they did not reflect the fact that the Government, between defendant's first filing (May 2, 1973) and second filing (June 11, 1973), had furnished the information requested as to the location and identity of the telephone and had suggested a course of action by which the defendant could seek pretrial access to premises 2119 North Philip Street.

At this juncture, therefore, the Court, rather than having presented to it (as Local Rule 9 envisions) a precise issue, clearly in dispute, embodied in a motion seeking a hearing and a judicial decision, had before it a xerox copy of a previously filed motion that still did not request a hearing and was facially ambiguous because it claimed that the Government refused to furnish information that was on the Court's record as having been provided more than two weeks before.

There was no evidence in the refiled motions that the defendant had attempted to secure access to the premises, and the fact of the matter is, it had not been attempted up to that date; although, four days later, on Friday, June 15, when the case was called for trial, an effort was made by the defendant's investigator to secure entry to the premises. The Court denied these refiled motions on Monday, June 18, 1973, which was the date the trial actually began. Still, defendant did not advise the Court that its efforts to gain access several days before had failed. The first that the Court knew of this was on Thursday, June 21, 1973 (see N.T. 3–187).

8. See counsel's letter of June 6, 1973, to Assistant United States Attorney, which is identified as Exhibit "A" to this defendant's memorandum filed October 24, 1973.

■ In summary, therefore, it can consummately be said that the efforts by this defendant to seek information in respect to the telephone at premises 2119 North Philip Street was from its inception defectively launched, and thereafter pursued in a manner that the District Court for the Eastern District of Pennsylvania had hoped and expected would disappear following the adoption of Local Criminal Rule 9. Actually, there is strong doubt that the defendant and the Government were in opposing camps on the question of visiting the Philip Street premises as late as Friday, June 15, 1973; because on that night, the defendant sent his investigator to that address in apparent agreement with the Government's suggestion to see if access could be achieved. Again, when that effort failed on Friday, June 15, the defendant, rather than advise the Court on Monday, June 18, when the jury selection process began, and when the Court entered its Order denying defendant's refiled motions, he waited until Thursday, June 21, when the case was in its third day of testimony to finally request the Court to formally rule upon his "pretrial" discovery motion for access to those premises. See, N.T. 3-187.) Obviously, the request at this stage was not a pretrial discovery request but a mid-trial request for discovery. It should be kept in mind at this time that the witness had testified for three days at length, including exhaustive cross-examination; she had confronted the persons that she had accused; she was still in Federal protective custody because of the threat to her physical well-being, and she was subject to recall as a witness. (See, N.T. 3-139.) She in fact was recalled as a witness again on July 2, 1973, the ninth day of trial. (See, N.T. 9-150.) Under all these circumstances, the Court ruled, and it believes correctly so, that the mid-trial request for discovery for the relatively limited purposes for which it was sought, particularly since there was alternative method of securing this information and which is discussed later,

was far outweighed by the likely disruption of the trial proceedings. This could easily occur if collateral hearings and proceedings would have to be undertaken on this discovery request or if this key witness' testimony, which had not yet been completed, would have been affected because of the intimidation or fear that could come from a visit to her home by one of the defendants or his representative. Furthermore, defendant has furnished no explanation as to why it did not seek the alternative means of discovering the information it wanted by issuing a subpoena to a representative of the telephone company who would have custody of the records and information in respect to the model and type of telephone instrument that was installed at the Philip Street premises, the location, the date of installation, and the various technical data that could have permitted the defendant's expert to make the kind of study that the defendant claims was necessary.

## JENCKS ACT

During trial, defense counsel requested the production of previously prepared written statements made by Government witnesses who were Philadelphia Police Officers. The police officers, although members of the Philadelphia Police Department, had been assigned to duty with the Office of Drug Abuse Law Enforcement (ODALE), a Federal agency. These officers had participated in the investigation, surveillance, and ultimate apprehension of the five defendants. The subject of counsel's request was a series of written reports compiled by the witnesses in the course of their assignment with the Federal agency, but submitted to their superiors in the Philadelphia Police Department, a state agency.

Dispositive of defendants' request for production by the Government of the reports is 18 U.S.C. § 3500(b), otherwise recognized as the Jencks Act. The statute provides, in pertinent part, that:

"(b) After a witness called by the United States has testified on direct examination, the court shall, on [the]

motion of the defendant, order the United States to produce any [written] statement of the witness *in the possession of the United States* which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). (Emphasis added.)

The testimony on this point shows, without any suggestion to the contrary, that the statements were not then, nor ever, in the possession of the United States but always in the possession of the local police department. See, United States v. Smith, 433 F.2d 1266 (5th Cir. 1970); Beavers v. United States, 351 F.2d 507 (9th Cir. 1965).

█ Evidence presented at trial indicated that ODALE was established and operated as a state-Federal investigative effort wherein state police officers were regularly assigned to work with Federal authorities. Notwithstanding the cooperative law enforcement effort of the Federal and state authorities, the fact of the matter is that the reports in question were compiled by the city police officers, submitted as a matter of course to their superiors in the police department, and are now (and were at the time of trial) in the lawful possession and control of the Philadelphia Police Department. The reports were at no time in the possession of the United States. Accordingly, the defendant's motion for production under the Jencks Act was denied.

Defense counsel was not absolutely foreclosed from obtaining and examining the statements. Rule 17 of the Federal Rules of Criminal Procedure provides for the issuance of a subpoena to compel the production of "books, papers, documents or other objects designated therein." Fed.R.Crim.P. 17, 18 U.S.C.A. The Court's Order denying counsel's motion to order the Government to produce copies of reports made to Philadelphia Police superiors was correct in law and in reason.

## TESTIMONY RESPECTING ARRESTS

Defendants next contend that the trial court erred in refusing to declare a mistrial upon an alleged prejudicial statement by a Government witness. The request for a mistrial was precipitated by the following testimony appearing at page 89 of volume 5 of the notes of testimony and elicited from Grant Beasley, a Philadelphia Police Officer assigned to the Office of Drug Abuse Law Enforcement (ODALE), who had completed his direct testimony for the Government. He was on the second day of his cross-examination, having completed his cross-examination by the lead defense counsel and three other defense counsel, and was proceeding through his fifth round of cross-examination at the hands of the fifth and last defense counsel.

\* \* \* \* \* \*

(1) "Q. . . . Did you ever bother in any one of these six occasions to get a search warrant to search any of these premises?

A. Yes, I did.

(2) Q. Do you have such a warrant?

A. A warrant was served at—. I can't remember the address, I believe it is in the 3900—wait a minute, 3700 block of Percy Street. We arrested an Oscar Peters. We arrested a Miss Amanda Shank on the highway with 19 bundles.

(3) Q. I ask you with respect to any of these defendants, was there a warrant issued and a search either at the Abbottsford Homes or at the garage at Oxford Street or any other area there?

A. Not at any garage or homes that you placed. I have arrested one of the defendants sitting there previous."

\* \* \* \* \* \*

It should be noted at the outset that the question that elicited the complained of answer (question number (3) above) was asked by one of defense coursel, and

there were no objections by any other defense counsel. In this context, it should be noted that the questioner represented only one defendant; yet, by his use of the word "defendants" in question number (3), he was obviously speaking as a questioner for all defendants, which should have alerted other co-counsel that their defendants' rights may be affected by the question, as well as the answer. Secondly, a careful reading of question number (1) indicates that the series of questioning began in respect to whether or not the officer had ever secured a *search* warrant in respect to certain *premises*. When the cross-examiner, however, asked the question that led to the answer in controversy here, he did not speak about a *search* warrant in respect to a *premises*, but rather simply a *warrant* as to any of the *defendants*. The witness was obviously led by the questioner to speak of a body warrant and not a search warrant when the question switched from the subject of a search of premises to a warrant in respect to defendants. The fact of the matter is that the witness furnished an answer that can be said to be clearly responsive to the question and a claim of "surprise" by defense counsel is clearly unjustified.

The defense was well aware of potential prejudicial testimony involving other acts of the various defendants and cannot now validly maintain that the results of the searching and exhaustive interrogation by their colleague, on their behalf, of a Government witness should be the basis for the granting of a new trial. The proffered testimony did not emanate from the calculated and inherently prejudicial questioning on the part of the prosecution, as was the situation in United States v. Gray, 468 F.2d 257 (3rd Cir. 1972).

■■■ The authorities are numerous that agree with the notion that a prejudicial item of evidence or a trial setback

experienced by a defense counsel cannot be complained of if it was caused by defense counsel. United States v. Walker, 421 F.2d 1298 (3rd Cir. 1970); United States ex rel. Choice v. Brierley, 460 F. 2d 68 (3rd Cir. 1972); United States v. Matthews, 346 F.Supp. 861 (E.D.Pa. 1972).

The background that preceded the questioning that led to the answer which defense counsel complained of includes the following:

(A) A review of the entries of appearance of defense counsel discloses that the array of counsel in this case represented in each instance attorneys who, cumulatively, have had many years at the criminal bar in state and Federal courts and who have been publicly and repeatedly acknowledged as highly skillful, successful, and experienced practitioners of the criminal law, particularly in jury trials of serious cases.

(B) At the outset of the trial, the Court suggested and counsel agreed that they would designate a lead counsel who the Court would consider to be the principal questioner but, without infringing upon any other counsel's right to object at any time, even though lead counsel was clothed with the authority to object on behalf of all, or question any witness after lead counsel had done so, provided such questioning was not unduly repetitious.[9]

(C) At the time the item here in controversy was asked, lead counsel, as well as three other defense counsel, had already cross-examined the witness and the last attorney was in the process of cross-examination.

(D) Despite admonitions by the Court on several occasions to avoid needless repetition, particularly in the sensitive areas, this counsel elected to explore an area that was both exhaustively covered and potentially sensitive.[10]

(E) The subject of "arrest" had been covered with other witnesses by all other

9. See, N.T. pp. 2–3, 2–5, 2–73, and 3–167.

10. See, N.T. pp. 1–21, 2–165, 2–175, 3–12, 3–100, 3–105, 3–136, 3–138, 4–45 to 4–46, 4–66, 4–126.

defense counsel on literally scores of other occasions in order to achieve purposes apparently expected by counsel to enhance their defense strategy.[11]

(F) All defense counsel were aware that his respective client had been subject to prior arrest at least once and, in some instances, many many times.[12]

(G) The defense counsel who asked the question in controversy had, at a previous suppression hearing out of the presence of the jury some months before, asked this question and knew what answer to expect from the witness before the question was asked.[13]

(H) All counsel had been present at that suppression hearing or had access to the transcript of that suppression hearing.[14]

(I) Defense counsel had demonstrated either a facility for objecting in time on other occasions when their co-counsel asked a question that was likely to invite an objectionable answer;[15] or, objecting to the reference by co-counsel to the plural "defendants" on the ground that it unfairly included his individual defendant;[16] or, a precise knowledge of the difference between a "body warrant" and a search warrant for "premises" during the trial.[17]

The foregoing points suggest the following questions:

(1) Why did the questioner, who was on the fifth round of cross-examination, continue to prod into areas that had been covered before, particularly in light of the constant admonishment by the Court to avoid repetitious and sensitive answers?

(2) Why did no other defense counsel object to the fifth counsel taking over the role of "lead counsel" by inviting arrest information as to all "defendants"?

(3) Why did no other defense counsel, with knowledge that each of their respective clients had an arrest history, invite additional repetitive inquiry into this area?

(4) On what reasonable ground can any defense counsel claim not to have expected the answer in light of the switch by the questioner from a reference to a search warrant of premises to a warrant in respect to a defendant?

(5) Why did the attorney who asked the question do so when he was the very attorney who asked about the same information at the previous suppression hearing, particularly when he knew that the answer given at the suppression hearing had to do with "arrests of the defendants"?

▇▇ While the Court is not prepared to say that the complained of answer was the result of deliberate defense strategy, it does conclude that under all the circumstances, including the knowledge and information that each of these experienced defense counsel had about

---

11. See, N.T. pp. 2–121 to 2–123, 2–138 to 2–139, 3–5 to 3–7, 3–15 to 3–16, 3–33, 3–57 to 3–58, 3–79 to 3–81, 3–94, 3–96, 3–126, 4–33 to 4–36, 4–98 to 4–103, 4–126 to 4–132, 4–136 to 4–137, 4–140 to 4–144, 4–146 to 4–152, 4–160, 4–165, 5–24 to 5–25, 5–101 to 5–102, 5–109 to 5–112, 5–166, 6–58, 6–64, 6–66, 8–41 to 8–49, 10–64 to 10–67, 10–173, 10–174, 10–176, 10–187, 11–22 to 11–25, 11–39, 11–50 to 11–59, 11–61, 11–65 and 11–66.

12. All defense counsel were furnished with copies of the U. S. Department of Justice arrest records for their respective clients before the trial began, indicating all defendants had prior arrests. See, N.T. p. 2–7 and court exhibits C–3 to C–7 added to the record by this Opinion; also see, transcript of suppression hearing held eight weeks before trial at pages 8, 54 to 58, 66 to 69, and 182; also defendants' hearing exhibits D–100 and D–101.

13. See, suppression hearing transcript at pages 54 to 57 and 66 to 69 where the same counsel (Mr. Yermish), again on cross-examination, asked the same witness (Officer Beasley) questions concerning "prior arrests" of defendants. Also see, hearing exhibits D–100 and D–101.

14. The official transcript of the suppression hearing was filed June 5, 1973; also see, N. T. pp. 5–39 and 5–53.

15. See, N.T. pp. 4–17, 4–45, 6–58, 7–20, 7–90, and 7–185.

16. See, N.T. pp. 5–138, 6–30, 7–20, 7–185, 8–83, and 10–78.

17. See, N.T. pp. 5–25 and 5–181.

the various arrest histories of their clients and the previous answers furnished by this very witness on the subject at a hearing outside the presence of the jury, the question was asked by one defense counsel and permitted to stand by the others with full awareness of the likelihood of the answer that is now criticized. Though not purposefully designed to occur, it was knowledgeably acquiesced in under circumstances where it might have been avoided by any one of the five defense counsel who in other instances in the trial demonstrated their knowledge of the means by which a protective measure may have been taken in timely fashion. The previously cited authorities support the Court's holding that, under the circumstances in this case, counsel cannot now be heard to object because of an error of their own making.

The Third Circuit has recently decided, in the case of United States v. Heckman, 479 F.2d 726, that the blurting out of evidence concerning a defendant's prior alleged misconduct does not automatically require District Judges to grant mistrials. The thrust of the *Heckman* decision is that the trial judge, who is in the best possible position to observe the effect of the statement on the jury, must determine whether the testimony elicited had such a devastating impact or was so highly prejudicial so as to "irretrievably sear itself into the conscious and subconscious minds of the jury." *Heckman*, p. 731.

An examination by this trial judge of the context and circumstances in which the testimony was elicited indicates beyond question that the introduction of such testimony was not such as to constitute a sufficient basis for the granting of a new trial. The witness did not specifically identify which of the five defendants had been the subject of the prior arrest, nor is it reasonable to assume that the jury attributed evidence of the arrest to any particular defend-

ant. Furthermore, the remark was neither pursued nor was it the subject of further questioning or comment or emphasis in any way. Also, the trial court recalls that the manner in which the witness delivered the remark was in a relatively ordinary and conversational context free of emphasis, elaboration, embellishment, or special enunciation.

Given these facts, together with the recognition that the comment did not apply to any particular defendant, the Court considers without hesitation that, in its view, the absence of appreciable prejudicial effect in the eyes of the jury is apparent and the defendants' rights to a fair trial by reason of that episode during the trial was in no appreciable manner diminished. It should also be recalled that throughout the trial there were repeated references that were clearly admissible or unobjected to references to arrests of various other defendants or of one of the Government informant witnesses.[18]

Because of this and in order to assure that there would be absolutely no question but that the jury would not consider the remark of Officer Beasley as damaging evidence against any or all or some of the defendants, the Court, without reminding the jury of the offensive remark, if indeed they would remember it, provided the following instructions that would guide them if they should recall such a remark:

"There has been testimony in this case that persons have been arrested . . . [O]fficers have testified in the trial on direct and on cross-examination about their participation in arrest episodes on various occasions.

"The mere fact of an arrest has no evidentiary value at all . . . The fact that a person has been arrested is not evidence of any guilt . . ." (Charge of the Court p. 12–13–21 through 22.)

Further, in order to assure that the jurors did not attribute any particular

18. See, in particular, notes of testimony at pages which are listed in footnote 11 of this Opinion.

item of evidence to a specific defendant unless they were absolutely sure that the evidence *described* such a defendant, the Court gave the following instructions:

"If any testimony as to any defendant upon consideration by you was vague as to identification, you should disregard it. . . . if testimony was vague or general as to identity, you should not just guess or as a matter of convenience say, 'That must have been defendant A, B, or C'; you should be convinced on identification of any defendant as to any act that he is charged with from the evidence in such a way that you are convinced clearly that it did apply to that defendant." (Charge of the Court p. 12–13–33.)

Obviously, the above instruction applied generally to all of the evidence in the case; nonetheless, it was specifically intended to apply to potential prejudice that may have been engendered by Officer Beasley's remark here being challenged.

In United States v. De LaRosa, 450 F.2d 1057 (3rd Cir. 1971), wherein a co-defendant testified that he had met the defendant in a state correctional institution, the court held that "while curative instructions may at times be ineffective, this is surely not the case where the prejudicial nature of the evidence is relatively mild and the manner of its presentation undramatic." (United States v. De LaRosa, *supra* at 1063.)

▇▇▇ The Court feels that, in the context and circumstances of this case, the statement elicited by defense counsel had no appreciable effect on the jury. See, United States v. Mitchell, 427 F.2d 644, 647 (3rd Cir. 1970). Any prejudice that possibly could have arisen from the unintentional and inadvertent statement was adequately cured by the Court's cautionary instructions to the jury as outlined above.

## BIASED WITNESS

Defendants submit that the failure of the Government to correct the testimony of Linda Johnson that she had not been promised anything in return for her testimony, when in fact this was false, constitutes a substantial ground for a new trial. Testimony adduced at trial revealed that Miss Johnson had pleaded guilty before Judge Zaleski in Philadelphia Court of Common Pleas to one count of assault with intent to kill and two counts of unlawful possession of narcotics, but that sentencing on these three charges had been deferred pending completion of the witness' testifying in the instant case, In an attempt to establish that the witness had received from the Government a promise of consideration in regard to the pending State Court charges in return for her testimony here, defense counsel propounded the following two questions:

\* \* \* \* \* \*

"Q. Now, have you been promised by anyone other than the public defender that you would receive favorable treatment from the court in these three cases because you are in fact cooperating with the police and the Federal authorities?

A. No.

Q. Is it your testimony that you have not been promised any help in your pending cases by the Government, by the United States attorney, or by the police?

A. No, the regular cops that I know, they told me they would help me as much as possible, but not because of this case, because I don't think they even know of this case." (N.T. p. 2–128.)

\* \* \* \* \* \*

While the witness' response to the second of the above two questions was apparently her unsophisticated understanding of how she expected to be helped, it was not in complete accord with the Government's understanding of its obligations. The Government had agreed to advise the appropriate state authorities of Miss Johnson's cooperation in this

matter. This fact was made known to all defense counsel. At a sidebar conference held subsequent to the testimony of Linda Johnson, the Assistant United States Attorney stated:

"[Assistant District Attorney] Taras Wochok and I sat down and talked and we sat down and talked with her and it was agreed that she should go and plead guilty and we would do anything, whatever we could, to influence the Court at the time of sentencing to give her a break for what she has been able to do." (N.T. p. 4–169.)

 This Court did not feel then, nor does it now, that Linda Johnson knowingly and intentionally testified falsely in response to the questions of defense counsel. As far as she was concerned, the Government had "agreed" to make known to the sentencing judge the fact of her cooperation in this matter. It is not unreasonable to expect that this uneducated female witness, whose life had been threatened and who had been subjected to extensive questioning, and whose home had been ransacked, would not adopt the precise nomenclature defense counsel would have preferred in describing what she hoped would be the Government's response to her cooperation.

 Equally unavailing is defendants' assertion that the Government failed to correct the testimony of Linda Johnson. As discussed previously, defense counsel were apprised of the aforesaid agreement between the Assistant United States Attorney, the Assistant District Attorney, and Linda Johnson during the course of a sidebar conference subsequent to the witness' departure from the witness stand. Linda Johnson was subject to extensive cross-examination and to recall at any time by defense counsel for the purpose of exploring this alleged agreement and bringing same to the attention of the jury.

Reliance by defense counsel on the case of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), is misplaced. In *Giglio*, the Government failed to disclose a promise of lenience made to its key witness in return for his testimony, even after the witness testified at trial that no promises of lenience were made to him. We are not faced here with the Government's failure to disclose such material evidence.

## ALLEGED VIOLATION OF COURT'S SEQUESTRATION ORDER

While testifying on direct examination, Agent Cassidy, chief investigative officer of the Office of Drug Abuse Law Enforcement (ODALE), stated that while conducting the surveillance of the premises located at 98 Manor Lane in Willingboro, New Jersey, he observed "Sonny" (Harvey Johnson) remove something from the trunk of a car parked on Manor Lane. Realizing that Agent Cassidy had mistakenly identified the individual he had observed there as "Sonny," the Assistant United States Attorney suggested to Agent Cassidy, at the close of the Court's afternoon session, that he review the investigative report that the agent had signed, specifically focusing the agent's attention on his testimony concerning the presence of Sonny at the scene of the surveillance.

Upon resumption of direct examination the following morning by the Assistant United States Attorney and in response to questioning by the prosecutor intended to reveal that the witness had been told to review his case report, Agent Cassiday corrected the misstatement of the previous day, indicating that it was Charles Harris that he observed and not Harvey Johnson. Defense counsel objected to the witness' answers that corrected the misstatement and then moved the Court to strike Agent Cassidy's testimony in its entirety and to declare a mistrial on the ground that the Assistant United States Attorney's instructions to his witness, Agent Cassidy, constituted a violation of the sequestration order imposed by the Court. Defendants' motions were denied

then, and must now be denied for the same reason.

The Court did not and does not consider the discussion between Mr. McBride and Agent Cassiday to be a violation of the Court's sequestration order.[19] The discussion in question occurred during a regular overnight break in the direct examination of the witness and was in connection with the ongoing testimony of the witness prior to his being released for cross-examination.

■■■■ The primary purpose of sequestration is to assure, as nearly as can be, that witnesses will be separated so that the testimony of one witness or a discussion of it will not become a basis upon which the testimony of another witness will be founded or affected. The Court has never known a sequestration order to be a bar to a counsel to communicate with his own witness in respect to trial or testimony preparation, provided such exchange is within the bounds of fairness and professional acceptability. There is nothing in the record to indicate that Agent Cassiday discussed his testimony with other witnesses, nor is there any evidence that the Assistant United States Attorney discussed the testimony of other witnesses with Agent Cassidy. The prosecutor's suggestion to the chief investigative officer that he review his report in preparation for his testimony that was to continue the following day was neither a violation of the Court's sequestration order nor beyond the realm of usual, proper, and expected communication between a counsel and his witness testifying on direct examination.

■■■■ In this instance, it was obvious that the prosecutor, in the presence of the jury, detected that the agent had made a mistake in the identification of one of the defendants, which mistake the agent later candidly acknowledged on the witness stand.[20] In the face of such

knowledge, not only did the prosecutor correctly advise his witness after the Court session to properly prepare himself for the following day's testimony; but it would have been unprofessional not to do so. It is considered unprofessional conduct for a prosecutor knowingly to offer false evidence, whether by documents, tangible evidence, or the testimony of a witness, or *fail to seek withdrawal thereof upon discovery of its falsity*. See, American Bar Association Project on Standards for Criminal Justice, "The Prosecution Function," Part V, § 5.6. The defendants have obviously confused the principles involved with sequestration and the manner in which witnesses should be permitted to have contact with other witnesses, and the principles governing the professional obligations of counsel to his witness and the Court, which was the factual situation presented to the Court here. The Court permitted this witness to be extensively cross-examined on every issue to which he spoke, including that of credibility.[21]

## INSTRUCTIONS TO THE JURY

■■■■ Defendants cite as reversible error the trial court's failure to instruct the jury that testimony from a person who is found to be an accomplice (in this case, the Government's informant witness, Linda Johnson) should be regarded as coming from a "corrupt and polluted source" and should be received by the jury with great caution and care. The instruction that the Court gave to the jury on the special care that should be given to the testimony of the informant Linda Johnson was as follows:

"The testimony of an informer who provides evidence against a defendant for pay or for immunity from prosecution or for personal advancement or vindication must be examined and weighed by you, the jury, with greater care than the testimony of an ordi-

---

19. See, N.T. pp. 7–6, 7–87 to 7–95, 7–126 to 7–135.

20. See, N.T. p. 7–29.

21. Virtually the entire seventh day of trial and one-half of the eighth day were devoted to cross-examination. See, N.T. p. 7–24 to 7–212; and see, N.T. p. 8–3 to 8–74.

nary witness . . . You must determine whether the informer's testimony has been affected by interests or by prejudice against the defendant." (Page 20 of the Charge.)

The trial court refused to either give the instruction requested by the defendants in substitution of or in addition to the above-quoted charge. Its ruling was based upon three reasons which are independently sufficiently to support the correctness of the Court's action.

First, the instruction referring to Linda Johnson as an "accomplice" would have been misleading and confusing to the jury, because her role in the case from both the Government's strategy and evidence as well as that of the defendants was that she had been before, during, and since the trial a paid Government informant. As a matter of fact, a review of the transcript indicates that neither counsel, nor any party, nor any witness, nor the Court ever referred to anyone as being an "accomplice" in the case. The uncontradicted testimony is that Miss Johnson provided essential assistance to state and Federal law enforcement officials involved in the investigation and ultimate indictment of the five defendants. In return for these services, and for information supplied, Linda Johnson (the informant), expected and received money from Government law enforcement sources. Defense counsel went to great lengths, and rightly so, to apprise the jury of the fact that Linda Johnson was an informant for the Government and that she was receiving money and other forms of reward for her services and that because of this her testimony was not to be believed. In this setting, when the time came to charge the jury, the Court was of the view that the jury should be instructed, in keeping with the flow of the evidence, as to the caution that they should give the testimony furnished by a paid informant.[22] Similarly, the Court was of the equally sound view that to refer to this witness in the Court's final charge to the jury not as an informant but as an "accomplice" would have been patently imprecise, confusing, and misleading. Defendants have furnished the Court with a series of cases that involve the testimony of accomplices, wherein the question of the instructions to the jury on the subject were brought to the Court's attention.

In United States v. De LaRosa, 450 F.2d 1057 (3rd Cir. 1971), five individuals were arrested and indicted for bank robbery and assault in the course of a bank robbery under 18 U.S.C. §§ 2113(a) and (d). The court defined De LaRosa, one of the five indicted defendants who had changed his plea to guilty prior to trial and then testified against the four remaining co-defendants, as "admittedly an accomplice." United States v. De LaRosa, at p. 1060. Similarly, in McMillen v. United States, 386 F.2d 29 (1st Cir. 1967), the court was confronted with the issue of whether the failure of the trial court to give a cautionary instruction as to the testimony of accomplice witnesses constituted reversible error. The two accomplice witnesses who testified for the Government at the trial of the case were both indicted as co-conspirators. One of the two had already pleaded guilty to robbery and conspiracy and was serving his sentence at the time his co-defendants were brought to trial. Furthermore, he was named as a defendant on a charge of armed robbery that was still pending against him at the time he testified against the other defendants. See also, Cash v. Culver, 358 U.S. 633, 79 S.Ct. 432, 3 L.Ed.2d 557 (1959); Dunn v. United States, 318 F.2d 89 (5th Cir. 1963).

In sharp contrast to these cases, the status of Linda Johnson in the instant

---

22. See the following pages in the notes of testimony where all counsel explore and develop Linda Johnson's role as an "informer": N.T. p. 2–112, 2–119, 2–130, 2–139, 2–153, 3–150 to 3–161, 4–4 to 4–8, 4–22 to 4–32, 4–37, 4–40, 4–49, 4–51, 4–54, 4–55, 4–60, 4–91, 4–102, 4–132, 4–136, 4–152, 5–4 to 5–9, 5–57 to 5–60, 5–91, 5–99, 5–226, 5–230, 11–9 to 11–12, 11–52 to 11–54.

case is quite different from that of the accomplice defendants who switched sides of the prosecution and became prosecution witnesses referred to in the above cases. She was neither indicted for her participation in the conspiracy, nor was she subject to future prosecution or punishment by reason of her testimony in this case; which is the usual basis upon which the testimony of an accomplice should be received with caution. This latter situation was what was evident in both the *De LaRosa* and *McMillen* cases and is demonstrably distinguishable.

Secondly, assuming *arguendo* that Linda Johnson was an indicted defendant who had been found guilty and then became a witness for the prosecution against her co-defendants, while she might be an "accomplice" in the *De LaRosa* and *McMillen* sense, there is no mandatory requirement that a trial court instruct the jury that testimony from an accomplice should be regarded as coming from a "corrupt and polluted source." The Court of Appeals for the Third Circuit laid that contention to rest in United States v. De LaRosa, *supra*, 450 F.2d at p. 1061. Therein the Court observed:

"Contrary to appellants' contention, this Court in United States v. Fawcett, 115 F.2d 764 (3rd Cir. 1940), did not establish a mandatory requirement that accomplice testimony be described as emanating from a corrupt or polluted source. It was merely held in *Fawcett* that, viewing the charge as a whole, it was not error for the trial court to instruct the jury that an accomplice's testimony was 'corroborated in some small degree.' The trial court in *Fawcett* had characterized accomplice testimony as coming from a polluted source. This Court did not indicase that 'polluted source' was an essential element of the charge, rather than a phrase which a trial court might in its discretion use when requested by the defendant."

Thirdly, the fact that the Court did not adopt the phrase ". . . corrupt and polluted source . . ." in its instruction is not a basis upon which error can rest. The Court is never bound in such circumstances to adopt the exact words, phrases, or language in a requested instruction, even though those words, phrases, or language appear in cited authorities. United States v. Bailey, 451 F.2d 181 (3rd Cir. 1971); United States v. Conversano, 412 F.2d 1143 (3rd Cir. 1969); Estes v. United States, 335 F.2d 609 (5th Cir. 1964), cert. denied, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559; White v. United States, 394 F.2d 49 (9th Cir. 1968).

## DOUBLE JEOPARDY

In a motion for judgment of acquittal, defendant Robert Green claims that the protection guaranteed to him by the Fifth Amendment against being placed in double jeopardy for the same offense has been violated by his prosecution in the present case.[23]

On October 5, 1972, Robert Green, along with Oscar Peters, George Glover and other persons whose names were unknown to the Grand Jury, was indicted on the charge of conspiring to possess and distribute eleven bundles of heroin, in violation of 21 U.S.C., § 841. Robert Green was further charged in this indictment (hereinafter the "1972 indictment") with the knowing and intentional use of a communication facility, to wit, a telephone, to facilitate the distribution of the eleven bundles of heroin, in violation of 21 U.S.C., § 843(b). The 1972 indictment alleges that the conspiracy and the five overt acts performed in furtherance of such conspiracy occurred on or about September 20, 1972, at 3819 North Delhi Street and at 8th and Erie

---

23. The Fifth Amendment to the United States Constitution provides, in relevant part: ". . . nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S.C.A.Const. Amend. 5.

Avenues, Philadelphia, Pennsylvania. On October 29, 1972, the defendant Robert Green pleaded guilty to the 1972 indictment before the Honorable Raymond J. Broderick, United States District Judge, and was sentenced on January 10, 1973, to eight years' imprisonment.

The later indictment was handed down by the Grand Jury on April 3, 1973. This indictment (hereinafter the "1973 indictment") charges that Robert Green conspired with Alvin E. Young, Harold E. Young, Charles Harris, and Harvey Johnson to distribute large quantities of heroin, in violation of 21 U.S.C., § 841. The 1973 indictment lists ten overt acts allegedly performed in furtherance of the conspiracy, all such acts occurring in Philadelphia, New York City, and New Jersey over the two and one-half year period between October 30, 1970, and April 3, 1973.

■■■ To support a claim of double jeopardy, it must be shown that the two offenses charged are in law and in fact the same offense. United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L. Ed.2d 627 (1966); Dryden v. United States, 403 F.2d 1008, 1009 (5th Cir. 1968). Offenses are not the same merely because they arise out of the same general course of criminal conduct, "they are the same only when the evidence required to support a conviction upon one of [the indictments] would have been sufficient to warrant a conviction upon the other." United States v. Pacelli, 470 F.2d 67, 72 (2d Cir. 1972). "When each offense requires proof of a fact not essential to the other, the charges are not identical, and the accused can be charged, tried and convicted of both offenses even though the charges arise out of the same acts." Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); Goldsmith v. Cheney, 447 F.2d 624, 627 (10th Cir. 1971).

■■ While the two indictments in question here alleged commission of the same type of crime, i. e., a violation of 21 U.S.C., § 841, the offenses charged are not factually the same. The conspiracy charged in the 1972 indictment occurred on or about one specific day— September 20, 1972; whereas, the later 1973 indictment alleges the existence of an ongoing conspiracy and the commission of overt acts in furtherance thereof over a period extending two and one-half years from October 30, 1970, to April 3, 1973.

The evidence required to prove the commission of the overt acts and to support a conviction upon the 1973 indictment would not have been sufficient to warrant a conviction upon the 1972 indictment. The particular criminal act to which Robert Green pleaded guilty under the 1972 indictment consisted of a telephone call made by defendant to Oscar Peters at his residence at 3819 North Delhi Street, Philadelphia, to advise Oscar Peters that the defendant was sending an individual named "George" to pick up eleven bundles of heroin and that the money for the heroin had already been received. The 1973 indictment contained no reference to Oscar Peters or to any telephone calls by the defendant. Moreover, the existence of the conspiracy as alleged in the 1973 indictment was proven by evidence presented at trial showing, *inter alia,* that on numerous occasions Robert Green, Alvin E. Young, Harold E. Young, and Harvey Johnson traveled to New York City for the purpose of purchasing heroin. The Government proved that during the course of the conspiracy, and pursuant thereto, Robert Green would assist in the transportation of the recently purchased heroin back to Philadelphia for its adulteration, packaging, and eventual distribution on the streets of Philadelphia.

It is clear that in order to prove the offenses enumerated in the two indictments, proof of facts essential to one charge but not to the other had to be

proven. The conclusion of this Court is that the Government has conclusively established the existence of two separate conspiracies and the criminal involvement in both by Robert Green.[24]

The Grand Jury charged in the 1973 indictment that Alvin E. Young, Harold E. Young, Charles Harris, Robert Green, Harvey Johnson, James H. Simmons (defendants) ; Linda Johnson (unindicted co-conspirator) ; and diverse other persons whose names were to the Grand Jury "unknown," did conspire to possess with intent to distribute and to distribute quantities of heroin, in violation of 21 U.S.C., § 841. Since this indictment was returned on April 3, 1973, approximately six months after the 1972 indictment was handed down on October 5, 1972, this Court must presume that the Grand Jurors and the Government were cognizant of the identity and past criminal conduct of Oscar Peters and George Glover, the individuals charged in the 1972 indictment as two of Robert Green's co-conspirators. As of April 3, 1973, neither Oscar Peters nor George Glover were persons whose names were to the Grand Jury unknown. Implicit in the absence of the names of Oscar Peters and George Glover from the long list of conspirators charged in the 1973 indictment is the conclusion that the Grand Jury considered the criminal activity that occurred on September 20, 1972, not to be a part of the ongoing, extensive conspiracy alleged in the 1973 indictment, but considered it to be a separate and distinct criminal offense. Probably the most significant ground for ruling against the claim of double jeopardy here comes from the defendant's respective positions before this Court and that of United States District Judge Raymond J. Broderick. Before my brother Broderick, he pleaded guilty. Before me, he continues to maintain his innocence. See, United States v. Pacelli, *supra*, 470 F.2d at p. 72.

24. Defendant Robert Green was the only conspirator common to the two indictments.

## APPENDIX

## LOCAL RULES OF CRIMINAL PRO-CEDURE

### Rule 9 and Rule 11

*Rule 9 Pretrial Discovery and Inspection.*

(a) Promptly after the arraignment, the United States Attorney and the defendant's attorney shall confer and upon request, the government shall:

(1) Permit defendant's attorney to inspect and copy or photograph any relevant written or recorded statements or confessions made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the United States Attorney;

(2) Permit the defendant's attorney to inspect and copy or photograph any relevant results or reports of physical or mental examinations, and of scientific tests or experiments and reports made in connection with the case by expert witnesses intended to be called by the government in connection with the case, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known to the United States Attorney;

(3) Permit the defendant's attorney to inspect and copy or photograph any relevant recorded testimony of the defendant before a grand jury;

(4) Permit the defendant's attorney to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places which are the property of the defendant and which are within the possession, custody or control of the government, or the aforementioned property belonging to third persons upon good cause shown;

(5) Permit defendant's attorney to inspect and copy the defendant's prior criminal record.

Upon request, the United States Attorney shall permit defendant's attorney to inspect, copy or photograph any evidence in the United States Attorney's file at such time it becomes evident that such material is favorable to the defendant as required by Brady v. Maryland, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963).

(b) If in the judgment of the United States Attorney it would not be in the interests of justice to make any one or more disclosures set forth in paragraph (a), disclosure may be declined. A declination of any requested disclosure shall be in writing, directed to opposing counsel, and shall specify the types of disclosure that are declined.

(c) If defense counsel desires to contest such declination or seeks additional discovery not specified in these rules, he shall confer with the United States Attorney after such declination or after such request for additional discovery with a view to satisfying these requests in a cooperative atmosphere without recourse to the Court. The request may be oral or written and the United States Attorney shall respond in like manner.

(d) In the event that the prescribed conference does not resolve the dispute concerning discovery, counsel shall serve notice of the intention to file a motion pursuant to the provision of Rule 11 not later than fifteen (15) days following the date of arraignment or such later time as the Court may fix. It shall contain:

(1) the statement that the prescribed conference was held;

(2) the date of said conference;

(3) the name of the Assistant United States Attorney with whom the conference was held;

(4) the statement that agreement could not be reached concerning the discovery or inspection that is the subject of the motion; and

(5) a request for a hearing before the Court to resolve the dispute, or, if the government thinks it appropriate, for an *in camera* hearing or a preliminary private inspection by the Court.

(e) Any duty of disclosure and discovery set forth in this Rule is a continuing one and all counsel shall produce any additional information gained by them. Failure to make such additional disclosure shall result in the invocation of Rule 16(g) of the Federal Rules of Criminal Procedure.

(f) Any disclosure granted by the government pursuant to this Rule of material within the purview of Rules 16(a)(2) and 16(b), Federal Rules of Criminal Procedure, shall be considered as relief sought by the defendant and granted by the Court.

*Rule 11 Pretrial Motion Practice.*

Motions other than motions under Rule 9 above, shall be filed within the time allowed by the Federal Rules of Criminal Procedure. All motions shall be filed with the Clerk of the Court, copies being sent to the Deputy Clerk of the Judge, and shall be accompanied by a brief or memorandum of law containing a concise statement of the legal contentions and authorities relied upon in support of said motion. A copy of each such motion and memorandum or brief shall be served upon the opposing party together with a notice of the date on which the motion will be filed, at least five (5) days prior to the date thus fixed for filing. Any party desiring to oppose the granting of such motion shall file in the aforementioned manner a factual answer and a brief or memorandum in opposition thereto, not later than 10:00 A.M. of the date set for filing of such motion. When required, oral argument shall be at a time fixed by the Court.